Terri DRAYTON, a minor, by her mother and next friend Bernice Drayton, and Bernice Drayton, Plaintiffs,

v.

The JIFFEE CHEMICAL CORPORA-TION, Defendant.

No. C 72–891.

United States District Court,
N. D. Ohio, E. D.

May 12, 1976.

Edward M. Swartz, Swartz & Swartz, Boston Mass., David A. Katz, Cleveland, Ohio, for plaintiffs.

Thomas P. Mulligan, Richard B. Whitney, Kathleen B. Burke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

BATTISTI, Chief Judge.

Defendant has moved this Court, pursuant to Rule 52(b) F.R.Civ.P., for an order amending its findings of fact and conclusions of law filed in the above captioned action on June 19, 1975. Also sought is an amendment of the judgment as provided for by Rule 59(e) F.R.Civ.P. or, in the alternative, a new trial pursuant to Rule 59(a) F.R.Civ.P. Plaintiff has countered with a cross-motion seeking to amend the Court's findings of fact and conclusions of law so as to substantially increase the amount of damages awarded.

■ Defendant contends that plaintiffs failed to meet their burden of proving that it was defendant's product that was being used at the time of the accident. It is admitted, however, that two witnesses, Henderson and Sorrell, testified that it was liquid-plumr that was in use on the night in question.

Reliance is also placed on the fact that Mrs. Drayton, in a prior deposition, testified that she had seen a bottle of liquid-plumr stored in the basement of the boarding house whereas the testimony at trial was that the product was kept in a first floor closet. Defendant equates this to "an admission that there may in fact have been two bottles of liquid drain opener in the house." Such an assertion, even if true, does nothing to shake the unequivocal testimony of the above two witnesses.

Defendant also relies on the fact that the drain cleaner "ate through" Mrs. Drayton's shirt as well as Terri Drayton's clothes. Great weight is given to the testimony of Mr. Summerfelt, the manager of specialty products for Clorox, that the effect of the chemical on Mrs. Sorrell's shirt was inconsistent with exposure to a 30% solution of sodium hydroxide and, in fact, was more consistent with exposure to sulfuric acid. Such testimony was predicated on the clothes in question being composed of cotton. This fact was not in evidence yet defendant states that cotton was "the fiber from which it is reasonable to presume one or both of these garments were made." Defendant fails to state why such a presumption is even permissible, much less reasonable.

■ Similarly, defendant refers to the fact that they were precluded by the Court from conducting an in-court experiment that presumably would have shown the relative effects of sodium hydroxide and sulfuric acid on cotton fiber. When it became evident that defense counsel intended to place a metal pan on the courtroom clerk's desk, place some cotton fiber therein, and introduce two highly caustic chemicals into the pan, the Court called the experiment to an abrupt halt. Given the fact that this case was filed in 1972 it would seem that such an experiment, even if relevant, could have been conducted during the three year period prior to trial. Additionally, to expect opposing counsel to effectively respond to such an experiment, conducted without any prior notice, is manifestly unfair and constitutes little more than trial by ambush.

With regard to defendant's statement that Dr. DesPrez testified that "the requisite period of contact-for-burn [was] a question of '60 seconds' or 'two minutes'" an additional comment is necessary. Dr. DesPrez also testified that the effect of liquid-plumr on human tissue was "momentary destruction." The latter statement was made in the context of Dr. DesPrez having treated another child for burns resulting from contact with liquid-plumr. Defendant also takes considerable license with the evidence when it states, in its summary of the "facts" that "there undoubtedly were two of such products in the house." Apparently only defendant is without doubt in the matter.

The legal arguments with regard to liability set forth in defendant's motion are

essentially those proffered in their pre-trial briefing and require little discussion. It should be noted, however, that contrary to defendant's belief, the court did not rely "solely on the testimony of Dr. Charles Beroes." All of the evidence introduced at trial was considered including the prior testimony of Mr. Vernon Summerfelt, defendant's own witness, that "liquid-plumr caused severe, irreversible damage" and that such statement accurately reflected his opinion even though, moments before, he had testified to the contrary.

■ The Court is equally mystified by defendant's continued reliance on a six-line excerpt from a twenty-five year old New York case. The courts of Ohio have proven themselves eminently qualified to develop their own body of law in the area of products liability. Under these circumstances, a federal forum, employing Ohio law, need look no further for guidance. In fact, for it to do so would be violative of the mandate of *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

Similarly, it is difficult to see why a finding of liability is ironic "in the wake of hearings concerning drain cleaning products conducted by the Consumer Product Safety Commission." Apparently the Commission allowed the continued marketing of liquid-plumr with the addition of a child resistant cap. Inasmuch as the product there involved was the reformulated, less caustic liquid-plumr it is difficult to see the relevance of the Commission's decision.

Also significant is defendant's construction of *Gossett v. Chrysler Corp.,* 359 F.2d 84 (6th Cir. 1966). According to defendant, "[p]rior case law . . . mandates the conclusion that a product is 'reasonably safe', under the guidelines adopted in *Gossett* when it is found to be fit for its intended purpose, and free of latent or undisclosed defects." The duty with regard to product design is correctly stated at 359 F.2d 87 and "includes a duty to design the product so that it will fairly meet any emergency of use which can reasonably be anticipated." As indicated in the court's findings of fact and conclusions of law, accidental spillage is such a foreseeable emergency.

■ Particularly troubling to the court is defendant's repeated attempts to argue that its representation of its product as "safe" "was generally used in its proper context that the produce (sic) was safe for use on plumbing fixtures and septic systems." The only reasonable inference that may be drawn from a representation that a product is "safe" is that it is not unreasonably dangerous to the person. Any other construction of the word would be as irrational as it was callous.

Defendant's motion also contains some eleven pages of detailed legal and economic analysis with regard to damages. None of this information, however, was contained in its pretrial briefing or proposed findings of fact and conclusions of law. Similarly, defendant's cross-examination of plaintiffs' economic expert, Dr. Burke, was somewhat less than searching. No attempt was made to examine Dr. Burke on his methodology or the underlying assumptions used in reaching his ultimate computation of lost wages. In fact, defendant offered no expert economic testimony at all. It was these circumstances that compelled the court to act so as to insure a fair and just result.

On October 15, 1975, this court, on its own motion, ordered a hearing in the above captioned action. On February 2, 1976 such hearing was held, at which additional expert economic testimony was taken with regard to the computation of damages contained in this court's memorandum opinion and order of June 19, 1975. Counsel were directed to address themselves solely to the questions contained in the October 15, 1976 order.

Plaintiffs' expert, Dr. John Burke, testified that the present value of the sum of money Terri Drayton would have earned during her lifetime, had she not been injured, was $878,951. This calculation was based, in part, on the assumption that Terri Drayton would have graduated from college, would have entered the work force in

the year 1989, and would have worked until the age of 60.

In calculating the present value of Terry Drayton's lost earnings, Dr. Burke utilized a typical rate of return for a liquid, long term, very safe investment such as long term government bonds. This rate of return was on a sliding scale, initially returning 6% on the investment and decreasing incrementally over the course of time until a 5% return was reached. It should be noted that Dr. Burke contemplated a liquid, risk-free, and revolving investment portfolio. This type of investment is characterized by long term assets being converted into short term assets which, in turn, are converted into cash, as needed. In this manner, the optimum combination of liquidity and return can be achieved.

Also reflected in Dr. Burke's calculation of lost wages was a 14% factor for fringe benefits of a non-pecuniary nature. The 14% figure represents the state-wide average for Ohio and is meant to compensate Terri Drayton for remuneration not directly reflected in a pay check.

Dr. Burke calculated Terri Drayton's work-life expectancy on the basis of statistical tables that compiled such data for men. He explained that the tables for women were less complete and he therefore chose not to rely on them. To adjust for the fact that Terri Drayton was a female, Dr. Burke "theoretically" removed her from the labor force three years earlier than might be expected theorizing that this would offset the use of male work-life expectancy data and enhance the accuracy of his computations.

The calculation of Terri Drayton's lifetime earnings was based on the premise that her income would increase at a rate of 12% per annum early in her life and thereafter increase at a decreasing rate until late in her life, at which point it would increase at an annual rate of 4.03%. The reason for this, according to Dr. Burke, is that most promotions (both lateral and vertical) occur early in one's work-life and thereafter factors that tend to increase income diminish in their frequency of occurrence.

On cross examination, Dr. Burke agreed that at present only 7–8% of the black female population graduates from college. Much, however, depends upon the environment in which a child is brought up and if the mother is an educated individual, the child's chances of graduating from college are enhanced.

According to Dr. Burke's figures, in 1989 when Terri Drayton would have entered the work force, her starting salary would have been $19,487.04. Salary projections were based on statistical tables for "males—all races" because in 1989, Dr. Burke felt males and females would be earning the same under equal pay for equal work provisions. Therefore, Dr. Burke used the statistical history of a college graduate's income and projected it to the year 1989 and beyond. The highest projected wage was for the year 2026 in which it was estimated that Terri Drayton would have earned a base salary of $267,000 with an additional $37,-000 in fringe benefits. Dr. Burke was not at all disturbed by the enormity of this figure and felt that earnings approximating that amount was "highly probable."

When questioned by defense counsel, Dr. Burke stated that there were essentially four components of personal income growth:

(1) aging—learning one's way around the labor market,

(2) productivity—through more and better use of machines,

(3) general increases in wages in the economy and

(4) general shifts in supply and demand. Inflation is only one reason why wages have grown and in Dr. Burke's estimation it will continue to increase at a minimum of 3% per year. Aging, on the other hand, accounts for approximately ½% per annum increase in wages while productivity has averaged approximately 2.9% a year since World War II. All of these factors were considered by Dr. Burke in arriving at his computation of Terri Drayton's lost wages.

Since no one, at this time, can accurately predict what residual earning capacity Terri

Drayton has, Dr. Burke assumed she would earn the minimum wage—as projected from its history. Assuming she were to work a 40 hour week, 52 weeks a year, the present value of her lifetime earnings would be $270,736. Subsumed in this figure is $17,000 in fringe benefits. The total figure is based on a computerized projection of the minimum wage, which from 1938 to 1975 increased at an average of 6.15% per year but which from 1971–75 increased at an average of 7.53% per year. Unlike Dr. Burke's calculation of lost wages, which presumed Terri Drayton to be a college graduate, this life-time computation of minimum wage earnings presupposes that she would enter the work force in 1985, at the age of 18, when she would have graduated from high school.

Assuming Terri Drayton might have earned what Dr. Burke projected she would, which might be somewhat optimistic in theory, and assuming that she will earn what Dr. Burke has also projected, which might be somewhat optimistic in fact, the net amount of lost wages, reduced to present value, is $608,215. This figure represents only a 1.3% upward variance from the courts' original award of lost wages.

With regard to the cost of future medical expenses, Dr. Burke utilized the same rate of discount as in computing lost wages and the same rate of growth as was reflected by the history of the minimum wage. Assuming an annual requirement of $10,000 (in current dollars) per year from 1976–2039, a fund with a present value of $890,000 will be required to meet the anticipated medical expenses. In the year 2039 the fund will be exhausted through periodic invasions of interest and principal.

From the time of Terri Drayton's injury until she turns 18, some $107,000 will be expended for medical care. Thereafter, until the year 2039, some $782,000 will, in Dr. Burke's estimation, be required for medical treatment. In computing the future cost of the medical care, Dr. Burke utilized the history of the minimum wage as a guide. This historical analysis reflects a range from 7.53% to 4.58%. Dr. Burke felt it

economically erroneous to utilize a constant rate of growth and preferred the minimum wage growth rate to the historical rate of inflation since the former is subject to some economic laws while the latter was felt to be entirely capricious. Historically, medical fees have run approximately 50% ahead of increases in the consumer price index.

Dr. Segal, testifying on behalf of defendant, could not compute a single figure for Terri Drayton's lost wages but instead felt compelled to offer three alternative figures based upon varying sets of circumstances. His basic source data was derived from Social Security Administration information on the distribution of earnings of all black women in the labor force. Dr. Segal further adjusted this data to reflect the fact that individual participation in the labor force varies with age.

In Dr. Segal's estimation, the upper limit of the present value of Terri Drayton's lost earnings is $193,769. This figure is premised on a rate of productivity of 2.4% and a .6% growth factor in the income of blacks which Dr. Segal felt would compensate for past employment discrimination. The combination of these 2 factors produced a growth rate of 3% which was coincidentally offset by Dr. Segal's initial choice of a 3% discount rate. The end result of this computation was that both the absolute dollar value and present value of Terri Drayton's lost earnings were the same.

Dr. Segal again calculated his estimate of the present value of the minimum amount of Terri Drayton's lost wages and the figure arrived at, $121,470, reflects a productivity rate of 2%, an "inequality benefit" of .5%, an interest rate of 4% and, as a result, a net discount rate of 1½%.

The third figure computed by Dr. Segal incorporated a deflation rate of 3½%, an inflation rate of 2½%, and therefore, a discount rate of 1%. Using these figures, the present value of lost wages was placed at $141,269.

In commenting on his underlying assumptions, Dr. Segal stated that, in his opinion, the upper limit for productivity was 2.4%. Dr. Burke, however, stated that since World

War II the productivity rate has been 2.9% and it was this more recent figure that Dr. Burke utilized in his calculations.

Significant, too, is the fact that Dr. Segal used a single economic factor—productivity—to compute future income growth. Dr. Burke, however, felt that productivity was only one of four growth factors affecting income and this is one reason for the wide disparity in their computations.

Dr. Segal was unable to compute any figure for Terri Drayton's residual earning capacity. Studies are presently underway seeking to develop a method whereby the residual earning capacity of handicapped persons might be quantified. Absent such definitive findings, Dr. Segal was hesitant to offer any opinion as to how much money Terri Drayton might reasonably be expected to earn during the remainder of her lifetime.

With regard to the future cost of Terri Drayton's medical care, Dr. Segal initially assumed that $600,000 in actual dollars would be expended over the course of the next 63 years. Dr. Segal stated that a fund with a present value of $199,113 would yield $9,523.81 per year for the remainder of Terri Drayton's life expectancy. Incorporated in this calculation is an expected 3% rate of interest and an annual productivity increase of 1½% in the area of medical services. This figure of 1½% represents past increases in productivity in *all* services rather than specific increases in medical productivity. Dr. Segal combined the above percentages and arrived at a discount rate of 4½% which in turn produced a present value of $199,213.

One of Dr. Segal's calculations of future medical costs includes the underlying assumption that the rate of inflation in the economy as a whole and the increase in medical costs will coincide. If such is the case, as medical costs increase, so too will the interest rate and the two factors will effectively cancel each other out. According to Dr. Segal, during the 1960's the increase in medical costs far exceeded the rate of inflation. Only since 1970 has the rate of inflation surpassed increases in medical costs. Dr. Segal's assumption that these two economic factors will increase in unison is a major factor in this overall computation of Terri Drayton's future medical expenses.[1] As a result, Dr. Segal offered alternative computations of future medical expenses based upon varying hypothetical rates of inflation. Assuming both 3% and 4% rates of inflation, the present value of a sum of money sufficient to meet Terri Drayton's future medical expenses would be $125,848 and $111,515 respectively. In commenting on these varying rates of inflation, Dr. Segal stated: "I have no opinion on it, but I use these as being numbers that I have heard bandied about." (Tr. at 168).

When queried as to the proper measure of damages for Mrs. Drayton's loss of Terri's services, Dr. Segal succinctly set forth the relevant considerations. In his opinion, there are a wide range of household services performed by a child above the age of 10 that can be assigned a relative market value. According to Dr. Segal, the total present value of those services varied between $2491.64 and $2212.03 when discounted at 0% and 1½%, respectively. The award of damages to Mrs. Drayton for the loss of Terri's services under this archaic cause of action must be substantially reduced. The law compensates her only for the monetary value of these lost services. Although difficult to quantify, an award of $20,000. to Mrs. Drayton under Count II of the complaint appears just and proper. This award presumes that Terri Drayton would have performed compensable services for her mother on an average of two hours per day. The award also reflects a salary rate of $3.43 per hour. Given the fact that Terri is an only child, such estimate of her household workload is not unreasonable. Similarly, in 1981 when Terri becomes a teenager, she can reasonably expect to earn $3.50 per hour, or more. Surely, anyone who might be hired to do the work Terri

---

1. According to the Consumer Price Index, doctors fees rose 11.8% in 1975 while the average cost for all goods and services rose only 6.8%. Cleveland Press, April 20, 1976, at A6, col. 1.

would have done could command such a salary. Therefore, the initial award to Mrs. Drayton is modified accordingly.

In evaluating the testimony elicited at the hearing, several comments are necessary. The first goes to documentation. While Dr. Burke's initial testimony at trial was thorough, he did not fully explain his methodology. The reason for this was clearly the absence of searching cross examination by defense counsel. At the hearing, however, Dr. Burke set forth his sources of information, his underlying assumptions, his reasons for choosing various alternative premises, and his ultimate result. Computer print-outs were introduced into evidence which embodied all of the above factors and from which Dr. Burke drew his conclusions. The figures ultimately arrived at were precise and at no time did Dr. Burke waver from his position.

Dr. Segal, on the other hand, could offer only alternative figures, based upon varying sets of circumstances, and, in at least one instance, stated that the answer to the court's question lie only somewhere within that range of figures. Dr. Segal's reasons for choosing certain figures, such as rates of inflation or return, were at times unclear. He offered no documentation to substantiate his calculations and his comment to the effect that he was, at one point, utilizing rates of inflation about which he had no opinion but rather had "heard bandied about" (Tr. at 168) did not add to his credibility.

In short, Dr. Burke's testimony was more precise, more thoroughly explained, and better substantiated. His conclusions were virtually identical with those he reached at trial and a second round of cross examination by defense counsel left them equally unshaken. Having given defendant a second opportunity to present economic testimony, the court is convinced that the initial award of damages, with one modification, represents a fair and just result. The award to Mrs. Drayton, on count II of the complaint, is reduced to $20,000.00. With that sole exception, defendant's motion to amend findings of fact and conclusions of law; to amend judgment; and, alternatively, for a new trial is denied. Similarly, plaintiff's motion to amend findings of fact and conclusions of law and to amend judgment accordingly is also denied.

IT IS SO ORDERED.