Terri DRAYTON, a minor, by her mother and next friend Bernice Drayton, and Bernice Drayton, Plaintiffs-Appellees Cross-Appellants,

v.

JIFFEE CHEMICAL CORPORATION, Defendant-Appellant Cross-Appellee.

Nos. 76–1941, 76–1942.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 6, 1977.

Decided Dec. 19, 1978.

Thomas P. Mulligan, Michael A. Nims, Richard B. Whitney, Kathleen B. Burke, Jones, Day, Reavis & Pogue, Cleveland, Ohio, for Jiffee Chemical Corp.

Edward M. Swartz, William Schwartz, Swartz & Swartz, Boston, Mass., David A. Katz, Cleveland, Ohio, for plaintiffs-appellees.

Before PHILLIPS, Chief Judge, and ENGEL and KEITH, Circuit Judges.

ENGEL, Circuit Judge.

The circumstances which gave rise to this Ohio diversity suit are set forth in the opinion of the district court:

The incident in question occurred on December 21, 1968. At that time both plaintiffs, the infant Terri Drayton and her mother Bernice Drayton, lived in a boarding house in Cleveland, Ohio. The house was occupied by several other tenants including James Henderson, the putative father of Terri Drayton.

At approximately 7:00 p. m. on the night of December 21, 1968 Bernice Drayton and her daughter were on the first floor of the boarding house readying it for Christmas by decorating the Christmas tree and retrieving toys and decorations from the basement. At about that time Henderson returned home and obtained a bottle of "liquid-plumr" from his landlady, Mrs. Sorrell, for the purpose of clearing a clogged drain in the second floor bathroom sink. As he ascended the stairs, Henderson had his daughter, Terri, in one arm and the bottle of liquid-plumr in the other. Henderson testified that as he climbed the stairs he read a portion of the label.

At the top of the stairs, Henderson put Terri on the floor in the hall and entered the bathroom alone. According to the testimony, he then poured half of the bottle of liquid-plumr into the drain and placed the uncapped bottle on the back of the sink adjacent to the left faucet. Henderson then placed a towel over the open drain and stepped back from the sink. At that moment Terri grabbed his leg and screamed. When Henderson looked down at the child, she had been doused with the liquid drain cleaner. Henderson testified that he was unaware of the child's presence in the bathroom until the instant he heard her scream.

Immediately after the accident, Henderson took the child downstairs where both Bernice Drayton and Mrs. Sorrell were present. Recalling that the label said "something about burns" and "something about water" Henderson wet his handkerchief and dabbed at Terri's face. After some confusion, Henderson, Mrs. Drayton, Mrs. Sorrell, and Terri drove to Forest City Hospital so that the child might be treated. Apparently the physicians at Forest City were not equipped to adequately cope with the extensive burns suffered by Terri Drayton. For that reason she was referred to University Hospitals for admission, a transfer that entailed an additional twenty-five minute delay. As a result of the injuries sustained on December 21, 1968, Terri Drayton has been hospitalized on eight separate occasions, undergone eleven operative procedures, and compiled a 190 page hospital record—all at the age of seven.

*Drayton v. Jiffee Chemical Corp.*, 395 F.Supp. 1081, 1084–85 (N.D.Ohio 1975) (footnote omitted).[1]

In a nonjury trial, the district court found the defendant Jiffee Chemical Corporation liable under Ohio law on theories of negligence, breach of express and implied warranties, and strict liability. The final judgment awarded damages of $1,620,000 to the child and her mother.

We uphold the district judge's finding of liability, but on the narrow ground of breach of express warranty. We hold that the damages awarded are excessive and modify the judgment, *Petition of United States Steel Corp. (II)*, 479 F.2d 489 (6th Cir.), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71,

---

1. The proofs showed that the scar tissue rendered her eyelids so taut that she must sleep with her eyes open and constricted her nasal passages, although not so much as to impair appreciably her breathing capability. Beyond this, her physical injuries were largely cosmetic. As the district court found, she "possesses normal anatomical functions." 395 F.Supp. at 1095.

38 L.Ed.2d 110 (1973), to reflect the amount which we conceive to be the maximum which can be justified by the evidence, construed in the light most favorable to the plaintiffs, but computed with due regard to the admonitions of this court contained in *Bach v. Penn Central Transportation Co.*, 502 F.2d 1117 (6th Cir. 1974), and *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626 (6th Cir.), *petition for cert. dismissed*, —— U.S. ——, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978).

## I. LIABILITY

### A. PRODUCT IDENTITY

The most impelling factual defense, although one not fully developed until the trial, was the claim of the defendant that Terri Drayton was injured not by Jiffee's product, Liquid-plumr, but by some other drain cleaner, by inference a product known by the very similar name of Mister Plumber.

The actual container which James Henderson, Terri's natural father, used to clear the bathroom drain was never recovered. While Liquid-plumr was shown at the time to have contained a solution of approximately 26% sodium hydroxide, commonly known as lye, Mister Plumber was shown to have been composed of 92–93% sulfuric acid. Defendant placed great emphasis on the trial testimony of its expert that Terri's injuries more closely approximated those caused by sulfuric acid than those which would have been caused by exposure to the lye. It also pointed to Henderson's testimony that he had read the label on the bottle and that his conduct both in applying the drain cleaner to the clogged drain in the bathroom sink and in later patting Terri's face with a damp towel rather than flushing it with water was more consistent with the instructions placed upon the bottle of the Mister Plumber product rather than those instructions on the bottle of Liquid-plumr.

Against this evidence, however, was the express testimony of Terri's mother, Bernice Drayton, of Henderson himself, and of their landlady, Mrs. Sorrell, who had originally purchased the cleaner and made it available to Henderson for the purpose. All three identified the product as Liquid-plumr. The testimony of the plaintiffs' experts established that Terri's facial injuries were consistent with those caused to human skin by contact with sodium hydroxide. There was also some contemporary corroboration in the history taken at the hospital for purposes of treatment indicative that the product spilled was Liquid-plumr. Under these circumstances, giving "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses," Rule 52(a), Fed.R.Civ.P., we are unable to hold that the trial judge's finding of fact that the product involved was Liquid-plumr, manufactured by defendant Jiffee Chemical Corporation, was clearly erroneous.

■ Defendant urges that the trial court abused its discretion in failing to permit an in-court demonstration comparing the effects of both Mister Plumber and Liquid-plumr upon clothing. Defendant insists that the test would have demonstrated the different properties of lye and sulfuric acid and thus might have convinced the trial judge as finder of fact that the injury stemmed from a sulfuric acid solution and not from its product.[2] It is true that defendant had entered a general denial that its product was involved. Nevertheless, in spite of extensive pretrial discovery over a period of several years, the particular claim of product misidentification was made for the first time in the middle of the trial. Under such circumstances, we cannot hold that the trial judge abused his discretion in refusing to permit the test. The case must, therefore, proceed upon the

---

**2.** The landlady, Mrs. Sorrell, who arrived at the scene shortly after the accident, testified that the solution ate through the child's clothing and the t-shirt against which Terri's head rested on the ride to the hospital. Defendant made an offer of proof to show that a relatively rapid destruction of clothing was more compatible with sulfuric acid than with lye, the main component of Liquid-plumr. The plaintiffs' expert testimony disputed this conclusion.

premise that the product which caused minor plaintiff's injuries was, in fact, Liquid-plumr and that it consisted of a 26% solution of sodium hydroxide, or lye.

## B. NEGLIGENCE, STRICT LIABILITY AND IMPLIED WARRANTY.

The proofs showed that Mrs. Sorrell purchased the Liquid-plumr from a local grocery store sometime in 1966, before Terri's birth, putting it aside for future use when needed.

The evidence was sparse concerning industry standards or the state of the art of manufacture and sale of drain cleaners for domestic consumption. What evidence there was tended to show that, if anything, Liquid-plumr was safer than any other liquid drain cleaner sold at the time, although not as safe as a composition later manufactured and sold by Jiffee's corporate successor.[3] The court did not expressly address the question of whether a manufacturer such as Jiffee could in 1966 reasonably have been expected to produce a safer product. And as the trial judge was careful to point out, "There was no evidence adduced at trial that liquid-plumr was negligently manufactured in that it was produced in any way other than that intended. Thus it becomes necessary to ascertain whether Jiffee was negligent in its design and formulation of the drain cleaner marketed as liquid-plumr." 395 F.Supp. at 1088.

While the trial court found that the Liquid-plumr was an "inherently dangerous" product, *id.* at 1088, this conclusion was based not upon its use as intended, but upon its misuse, much as one might find any product dangerous whose very nature and purpose depends upon its being or having at least some dangerous properties, such as a knife, a baseball bat, diving apparatus, and the like. *See Englehardt v. Phillips*, 136

Ohio St. 73, 23 N.E.2d 829, 833 (1939). It is this circumstance and our own court's ruling in *Gossett v. Chrysler Corp.*, 359 F.2d 84 (6th Cir. 1966), which give us serious concern whether, at the time of its manufacture, Jiffee could fairly be held liable under theories of strict liability or negligence in the design of its product or in breach of the implied warranty of fitness for the use intended.[4] In *Gossett* our court defined what it conceived to be the rule in Ohio:

> It is the duty of a manufacturer to use reasonable care under the circumstances to so design his product as to make it not accident or foolproof, but safe for the use for which it is intended. This duty includes a duty to design the product so that it will fairly meet any emergency of use which can reasonably be anticipated. The manufacturer is not an insurer that his product is, from a design viewpoint, incapable of producing injury.

359 F.2d at 87.

The Ohio Supreme Court has subsequently approved and applied this same standard in *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267, 273 (1977).

With respect to the parallel charge that the defendant was negligent in the packaging and labeling of Liquid-plumr, the trial court held:

> While the liquid-plumr container might be characterized as having unstable geometry and installation of a safety cap might be more desirable, plaintiffs have not shown by a preponderance of the evidence that a reasonably prudent man acting under similar circumstances would have packaged liquid-plumr differently.

395 F.Supp. at 1090.

Recognizing a duty of the manufacturer to warn the purchaser of circumstances in which a product may present a danger in the course of intended use, *Shumard v. Gen-*

---

**3.** Proof of the change in the Liquid-plumr formula was elicited by defense counsel, and no attempt was made to limit the trial court's consideration of this evidence. We, therefore, express no opinion as to its admissibility. *See generally* Fed.R.Evid. 407.

**4.** The Supreme Court of Ohio appears to use the concepts of strict liability and implied warranty interchangeably. *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 185, 193–94 (1965). *See also Strimbu v. American Chain & Cable Co., Inc.*, 516 F.2d 781, 783 (6th Cir. 1975); Restatement of Torts (Second) § 402A, Comment m (1965).

*eral Motors Corp.*, 270 F.Supp. 311 (S.D. Ohio 1967), the trial judge held that warnings and safety instructions on the label were in law sufficiently specific and concluded that "liability cannot be predicated on the design of the liquid-plumr container or the contents of its label." 395 F.Supp. at 1090.[5]

The trial judge, however, found that in marketing Liquid-plumr, Jiffee breached its implied warranty of merchantability under 13 Ohio Rev.Code Ann. § 1302.27(B)(3) (Baldwin) (U.C.C. § 2–314) because the product was not "fit for the ordinary purposes for which such goods are used."

Since the unrefuted proof showed that there was on the market at the time of its sale no safer liquid drain product which was as effective as Liquid-plumr, we have sufficient concern about the correctness of the district court's holding to refrain from addressing it on appeal.

We view the trial judge's holdings that the product was negligently designed, unreasonably dangerous and not fit for its intended purposes, especially where he held concurrently that the labeling was adequate, as tantamount to a ruling that it was in violation of the law for the product to have been marketed at all for home consumer use. Because of the very limited evidence on the state of the art at the time of its manufacture, because of widespread use of this and like products throughout the United States at the time, and because the injury resulting came not from the product's proper use but from its misuse, we refrain from ruling upon the trial judge's conclusions of liability on the basis of a breach of implied warranty, strict liability and negligent design.[6]

The trial judge's finding, however, that the defendant was guilty of a breach of an express warranty finds sufficient support in the record to uphold his finding of liability.

5. The plaintiffs do not cross-appeal the trial court's conclusions as to packaging and labeling, and we therefore have no occasion to address the correctness of these rulings.

6. Our court has not been hesitant in ruling on such issues as a matter of law. *See Gossett, supra,* 359 F.2d at 88–89. *See also Steagall v.*

## C. EXPRESS WARRANTY

Mrs. Sorrell testified that when she bought the drain cleaner, she had already seen it advertised on television as "safe" and capable of "fast action." She testified that on the basis of those representations, she had purchased the cleaner. James Henderson also testified that before the accident he had seen television and newspaper advertisements for Liquid-plumr. He remembered that "they said it was safe."

Defendant admitted that until 1967 it had employed the term "safe" in connection with both its radio and newspaper advertising. The admission was confirmed by the exhibits. Newspaper advertisements described Liquid-plumr as "safe, fast-working" and giving "magic performance." In addition, defendant acknowledged that contemporaneous television commercials had even shown a human hand swishing water around in a kitchen sink as evidence that the product was safe. While this advertising was halted by the agency which handled Jiffee Chemical Corporation's advertising accounts "to avoid any possible misinterpretation" of the word "safe," it was only after the Code Authority of the National Association of Broadcasters intervened and questioned the advertising copy in this regard.[7] The defendant's own expert witnesses conceded that the product was not, in fact, safe and the defendant's assertion that the representation was only meant to convey that the product would not injure drains was properly rejected by the trial court in view of the absence of any indication that the warranty was so limited. 413 F.Supp. 834 at 836.

Since 1962, Ohio's version of the Uniform Commercial Code has provided:

**Express warranties by affirmation, promise, description, sample.**

*Dot Mfg. Co.*, 223 Tenn. 428, 446 S.W.2d 515 (1969) (drain cleaner accident).

7. Even the president of Jiffee's advertising agency conceded, in a letter to the Code Authority, that the hand-swishing scene was "controversial" and that the use of the word "safe" was "questionable."

(A) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(2) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

13 Ohio Rev.Code Ann. § 1302.26 (Baldwin) (U.C.C. § 2–313). Later Ohio decisions, however, have continued to rely upon the pre-existing Ohio law of products liability, largely ignoring the Uniform Commercial Code. *E. g., Inglis v. American Motors Corp.*, 3 Ohio St.2d 132, 209 N.E.2d 583 (1965) (express warranty); *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 185 (1966) (third-party beneficiaries). In 1958 the Ohio Supreme Court ruled that where representations concerning the safety of a product are made by a manufacturer and are proved to be false, an action for express warranty could be maintained. *Rogers v. Toni Home Permanent Co.*, 167 Ohio St. 244, 147 N.E.2d 612 (1958). Further holding that the breach of an express warranty which resulted in personal injury was more akin to the historical action of trespass on the case and hence "sounds distinctly in tort," the Supreme Court of Ohio held that the injured consumer who relies upon the express warranty to his detriment can recover even though there is no direct privity of contract between him and the manufacturer.[8] 147 N.E.2d at 615–16. Here both the purchaser, Mrs. Sorrell, and the ultimate consumer, Mr. Henderson, testified to having seen and relied upon specific advertisements that the product was safe. While this testimony concerning reliance might be viewed with skepticism because self-serving, it is obviously the nature of such advertising that it will, in fact, encourage and persuade the consumer to purchase and to use the product so advertised. It is not surprising that the trial judge would, under the circumstances here, have credited that testimony.

Since the representation was reasonably construed by the ·trial judge as finder of fact to pertain to the safety of the product for human contact, and since its properties are not such as would be commonly apparent to the user, we agree with the trial judge that the breach of an express warranty, if causally related to the injury, was actionable.

## II. INTERVENING CAUSE

■ Defendant vigorously argues that notwithstanding any earlier fault on its part, the chain of causation between that fault and the ultimate injury to Terri Drayton was broken by the intervening conduct of James Henderson in somehow causing the bottle of Liquid-plumr to spill. This, defendant urges, was the sole proximate cause of any injury suffered by the child. In support defendant cites the general rule that the plaintiff must prove that the defect was the direct and proximate cause of the plaintiff's injury. *Lonzrick v. Republic Steel Corp.*, 6 Ohio St.2d 227, 218 N.E.2d 185, 192–93 (1966). Defendant particularly relies upon *Thrash v. U-Drive-It Co.*, 158 Ohio St. 465, 110 N.E.2d 419 (1953):

[W]here there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could and should have eliminated the hazard, the original agency is relieved from liability. ·A break in the chain of causation thereby takes place which operates to absolve the original agency.

110 N.E.2d at 422.

■ As defendant observes, in Ohio the doctrine of intervening cause has been found applicable to actions in both strict tort liability and breach of warranty, as well as to negligence actions. *See, e. g., Strimbu v. American Chain & Cable Co.,*

---

**8.** *Compare* 13 Ohio Rev.Code Ann. § 1302.31 (Baldwin) (U.C.C. § 2–318) (third-party beneficiaries).

*Inc.,* 516 F.2d 781, 783–84 (6th Cir. 1975); *Lonzrick, supra,* 218 N.E.2d at 188.

The district judge did not resolve whether Henderson's actions amounted to negligence, although it is apparent that he concluded that Henderson somehow caused the bottle to spill. At the same time he recognized that the risk of spillage was foreseeable. Indeed, the defendant specifically acknowledged as much. 395 F.Supp. at 1092–93 & n. 6. Therefore, he reasoned, the intervening act of Henderson did not break the chain of causation:

> The essential intervening acts that defendant relies on are Henderson's leaving the half-full bottle of liquid-plumr uncapped while attempting to replace it on the sink and in the process dropping or knocking it to the floor.
>
> The nature of liquid-plumr is such that its utilization inevitably requires some form of human agency. The bottle must be uncapped and its contents introduced into the drain by the acts of human hands. Under these circumstances, one situation becomes immediately foreseeable—the presence of an open, partially filled bottle of liquid-plumr in a human hand. Since the directions on the bottle call for half of its contents to be used immediately and half to be held in reserve for use, if necessary, human experience would dictate that in the ordinary course of events a consumer might foreseeably place an uncapped bottle on a sink or bathtub ledge. Neither is it unforeseeable that spillage might occur as a result of some inadvertent act by the consumer. This is precisely the situation that was present immediately prior to Terri's accident.

395 F.Supp. at 1092–93 (footnote omitted).

■ Under Ohio law, proximate cause is a factual issue. *Utzinger v. United States,* 432 F.2d 485, 489 (6th Cir. 1970); *Gedeon v. East Ohio Gas Co.,* 128 Ohio St. 335, 190 N.E. 924 (1934). This is true even in determining whether an independent and intervening act is sufficient to cut off the chain of causation. *Utzinger, supra,* 432 F.2d at 489. Defendant insists that "[a] compre-hensive review of the Ohio cases on intervening cause leads to the conclusion that . . . action or inaction by an adult who knows or should know of the hazards created by the defendant's activity and who is in a position to avoid or eliminate such hazard will always terminate the liability of a defendant who is an antecedent wrongdoer by breaking the chain of causation." This assertion appears to be an overstatement.

> [T]he mere fact that the intervention of a responsible human being can be traced between defendant's wrongful act and the injury complained of will not absolve him.

*Mouse v. Central Savings & Trust Co.,* 120 Ohio St. 599, 167 N.E. 868, 870 (1929). *See also Mudrich v. Standard Oil Co.,* 153 Ohio St. 31, 90 N.E.2d 859, 863 (1950). And in *Taylor v. Webster,* 12 Ohio St.2d 53, 231 N.E.2d 870 (1967), the court held:

> A rule of general acceptance is that, where the original negligence of the defendant is followed by the independent act of a third person which directly results in injurious consequences to plaintiff, defendant's earlier negligence may be found to be a proximate cause of those injurious consequences, if, according to human experience and in the natural and ordinary course of events, defendant could reasonably have foreseen that the intervening act was likely to happen. *Pudlo v. Dubiel,* 273 Mass. 172, 173 N.E. 536.
>
> Or, stating the proposition a little differently, the connection between the defendant's negligence as a proximate cause of an injury is not broken, if an intervening event is one which might in the natural and ordinary course of things be anticipated as reasonably probable, and the defendant's negligence remains an important link in the chain of causation. *Neff Lumber Co. v. First National Bank of St. Clairsville,* 122 Ohio St. 302, 171 N.E. 327, citing *Mouse v. Central Savings & Trust Co.,* 120 Ohio St. 599, 167 N.E. 868.

231 N.E.2d at 872–73. *See generally* Restatement of Torts (Second) § 447 (1965).[9]

■ The trial judge did not directly discuss the issue of proximate cause and intervening negligence in terms of breach of express warranty. The factual findings, however, support a finding that the breach of express warranty proximately caused Terri's injuries notwithstanding Henderson's intervening conduct.

Liquid-plumr was marketed and designed for home use. Accidental spillage during normal use was at least a reasonably foreseeable concern. It was surely within the range of proofs for the court to have concluded that the defendant's false assurances of safe use were intended to allay public concern as an inducement to purchase the product. Analyzed in terms of breach of express warranty, therefore, the question becomes whether the warnings on the container, which otherwise might have been fully adequate, sufficed to overcome the impact of the earlier misrepresentation. Henderson testified that he had read and seen the advertisements. He admitted, too, that he had read the warning on the label, but gave it only a "cursory examination." Might he have paid closer and more careful heed to the warning, had his concerns not earlier been allayed by the false advertising? The answer was peculiarly within the province of the trier of facts, not of this court.

## III. DAMAGES: THE AWARD

The trial judge originally awarded Terri Drayton a total of $1,600,000 in damages— $500,000 for the present value of loss of future income, $600,000 for the present value of anticipated future medical care, and $500,000 for past and future pain and suffering. Terri's mother, Bernice Drayton, was awarded a total of $112,466, $12,466 for past medical expenses incurred to the date of trial and $100,000 representing the value of Mrs. Drayton's loss of her daughter's services and society. 395 F.Supp. at 1096–97.

■ Upon a rehearing the trial judge supplemented his findings with respect to Terri's damages but left their amount untouched. 413 F.Supp. at 836–39. With respect to the claim of Bernice Drayton, however, he eliminated damages for the loss of society,[10] and reduced Mrs. Drayton's damages to $20,000. The reduced figure included $12,466 for medical expenses, the balance representing loss of Terri's services during her minority. *Id.* at 839–40.

This appeal presents an unusual problem for appellate review. A careful reading of the entire record of the trial compels the conclusion that the trial judge, from the outset, was emotionally involved. It manifested itself in one-sided interrogation of witnesses by the court, in restrictions on cross-examinations and even in repeated interruptions of defense counsel's closing argument. That the involvement came from compassion for the pitiable condition of the child is understandable. It was, however, an involvement which at times raised a serious question whether the trial met those fundamental standards of fairness which every litigant before a federal court has a right to expect.

---

**9.** *See also Freeman v. United States,* 509 F.2d 626 (6th Cir. 1975), construing Ohio law in determining that the intervening negligence of a pilot and jump master did not exonerate a traffic controller who negligently misidentified the airplane, causing a number of sky divers to jump to their death into Lake Erie.

**10.** While plaintiffs filed a cross-appeal, the notice of appeal did not properly preserve for review the district court's ruling on societal loss. Rule 3(c), Fed.R.App.P., obligates a party to designate in the notice of appeal "the judgment, order or part thereof appealed from . . . ." The plaintiffs' notice of appeal pertains only to the orders and judgment of the district court "insofar as [they] deny plaintiffs recovery for punitive damages and deny recovery for the value of necessary services to Terri Drayton during her minority." In view of the requirement of Rule 3(c), the issue of Bernice Drayton's right to recover for loss of society is not before us, even giving the notice of appeal a liberal construction. *See Terkildsen v. Waters,* 481 F.2d 201, 205–06 (2d Cir. 1973); 9 Moore's Federal Practice ¶ 203.18 at 756–57 (1975). We therefore decline to review the judgment as to this issue.

While the appellant, in seeking reversal, has moved for a new trial, it has not further sought to have the case assigned to another judge. Although we have seriously considered awarding a new trial before another judge as to all issues, we decline to grant such drastic relief, since the record does not reflect any personal bias against the defendant or its counsel, but rather an excessive reaction to a truly heartrending condition. We are convinced, however, that the court's involvement led it into error in the calculation of damages.

■ Viewing the evidence most favorably to the plaintiffs, as we must here, *e. g.*, *United States v. Summit Fidelity & Surety Co.*, 408 F.2d 46, 48 (6th Cir. 1969), Terri Drayton's injuries, if compensable at all, require a substantial award, although no monetary award, however large, can ever eliminate her disfigurement. For even the most horrendous injuries, however, the law still applies a rule of just compensation based upon proof establishing those injuries and compensations with reasonable certainty. *E. g., Hetzel v. Baltimore & Ohio R.R. Co.*, 169 U.S. 26, 37–39, 18 S.Ct. 255, 42 L:Ed. 648 (1898) (Harlan, J.); *Petition of United States Steel Corp. (I)*, 436 F.2d 1256, 1269 (6th Cir. 1970), *cert. denied*, 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). By any standard of reasonableness, we conclude that the damages awarded here are excessive.

## A. ECONOMIC EVIDENCE AND PROJECTION OF FUTURE LOSS

This circuit's rule concerning the employment and consideration of expert testimony and the projection of future damages based upon such expert testimony has been carefully expressed in *Bach v. Penn Central Transportation Co., supra*, and more recently in *Morvant v. Construction Aggregates Corp., supra.* Thus, we have held that while the trial judge is within his discretion in permitting the testimony of economic experts concerning future damages, the court must still "keep such extrapolations within reasonable bounds and insure that they conform to the evidence." *Bach, su-*

*pra*, 502 F.2d at 1122, *citing Har-Pen Truck Lines, Inc. v. Mills*, 378 F.2d 705, 709–10 (5th Cir. 1967). *Accord, Morvant, supra,* 570 F.2d at 632. In *Morvant,* we expanded somewhat upon the rationale of *Bach* to observe that "[w]hat *Bach* aimed at preventing was a projection of statistical data so attenuated as to be *reductio ad absurdum*, thus allowing damages to be ballooned beyond all rational experience." *Morvant, supra,* 570 F.2d at 632 n. 5. Repair to the testimony of the experts amply demonstrates the consequences of such ballooning here and how it affected the trial judge's award of damages.

## B. FUTURE LOSS OF INCOME

With respect to damages representing the loss of future income, plaintiffs presented the testimony of an economist, Dr. John Burke. Although at the time of trial Terri, a black female, was seven years old, Dr. Burke's projections assumed that she was entitled to have her projected loss of income measured by the existing income standards of male college graduates, 25 years of age and over, ignoring altogether any tables for the earnings of females of any level of educational attainment or of persons under age 25. To these assumptions, Dr. Burke made additional increments based upon a projected diminishment in the purchasing value of the dollar and an increase in a projected growth of earning capacity over Terri's working life. His only concession to plaintiff's sex was a conclusion that she would probably cease working in the year 2027, at which time she would attain the age of 60 years. Further, Dr. Burke assumed that Terri's facial disfigurement made her totally unemployable, although there was in fact no functional, anatomical impairment. Relying on computer printouts, Dr. Burke was permitted to testify that the total earnings of a seven-year old black female child over her entire life, with retirement at age 60, would be the sum of $5,550,000. This conclusion was based upon his determination that Terri's income would rise steadily until in the year 2026 she would earn $304,861, including a factor of

18% for fringe benefits. Reducing the former sum to a present value based upon varying discount rates, Dr. Burke arrived at a present value figure of $878,951. It is obvious from the trial court's published opinions that it credited and employed this latter figure as a credible, reasonable base from which to arrive at its own determination of $500,000 for lost wages. The trial court recognized that at least one factor was uncertain in Terri's future, that being whether it could fairly be projected that her future income would parallel that of an average college graduate.[11] On this basis, apparently, he held that a "more realistic appraisal" is $500,000. 395 F.Supp. at 1096.

Upon rehearing, the trial judge took further economic evidence but reaffirmed his original conclusion regarding Terri's future earnings. Dr. Burke's further testimony at the post-trial hearing provided what can only be characterized as a *post hoc* justification for the trial judge's original figure. The trial judge summarized that testimony as follows:

> Since no one, at this time, can accurately predict what residual earning capacity Terri Drayton has, Dr. Burke assumed she would earn the minimum wage—as projected from its history. Assuming she were to work a 40 hour week, 52 weeks a year, the present value of her lifetime earnings would be $270,736. Subsumed in this figure is $17,000 in fringe benefits. The total figure is based on a computerized projection of the minimum wage, which from 1938 to 1975 increased at an average of 6.15% per year but which from 1971–75 increased at an average of 7.53% per year. Unlike Dr. Burke's calculation of lost wages, which presumed Terri Drayton to be a college graduate, this life-time computation of minimum wage earnings presupposes that she would enter the work force in 1985, at the age of 18, when she would have graduated from high school.

Assuming Terri Drayton might have earned what Dr. Burke projected she would, which might be somewhat optimistic in theory, and assuming that she will earn what Dr. Burke has also projected, which might be somewhat optimistic in fact, the net amount of lost wages, reduced to present value, is $608,215. This figure represents only a 1.3% [sic] upward variance from the courts' [sic] original award of lost wages.

413 F.Supp. at 837–38.

Dr. Burke, in making his second projection, assumed that notwithstanding her injuries, Terri Drayton would have a residual earning capacity which would enable her to earn the minimum wage, but even these calculations were based upon the same computerized and speculative projections that he had earlier used. Thus, Dr. Burke concluded that a person of Terri's age might expect lifetime earnings at a projected minimum wage which would come to a lifetime total of $1,444,332.96, reduced to present value at $270,000. The lifetime earning estimate in turn was based upon an assumption that in the year 2025, the last year at which he assumed Terri Drayton would be employed, the prevailing minimum wage would be $68,785.60 per year, plus fringe benefits and social security. The assumption that Terri's gross loss of earning capacity would be reduced by her earning a minimum wage and the fact that that amount itself was subject to the same infirmity tend to ameliorate the original error, but the calculations do not cure it. Both calculations by Dr. Burke are subject to the same infirmity complained of in *Bach* and *Morvant* and can only be characterized as a compounded accumulation of conjecture which is not, in our judgment, rendered reasonable or within the realm of probability because of the seemingly scientific way in which they were reached.

In determining the future earnings of an injured party and the present value thereof, *Bach* and *Morvant* clearly

---

11. The sole basis for this conclusion is evidence that she performed well in her first year of schooling and the opinion of Dr. Bernstein and additional lay testimony that Terri "is a bright child."

indicate that it is entirely proper to permit expert testimony concerning the rates of interest, amounts and returns on investments, present earning values, previous existing rates of inflation or deflation and change in the purchasing power of the dollar, and economic testimony concerning the history of the increase of productivity of the average American worker and to consider the possibilities that these variables will continue into the future. As we observed in *Morvant*:

> In fairness to the trial judge, we recognize that he may have concluded that plaintiff's economist was endeavoring to present to the jury the type of future projection which was rejected in *Bach* as being too speculative. At the same time it is clear that *Bach* does not bar all such expert testimony and holds that, in fact, it is error to preclude a jury from considering factors affecting future wages such as inflation and, we conceive, evidence of an individual's propensity to increase in productivity and hence earning capacity.

*Morvant, supra,* 570 F.2d at 632 (footnote omitted). The trial court's error was not, therefore, in receiving testimony to this effect nor in having considered these factors, which were altogether proper, but in receiving and seriously considering projections which well outrun any reasonable prediction. The error is, of course, compounded by the highly uncertain nature of the factors which went into the computerized projections, *i. e.,* whether Terri would have gone on to college, and, if so, whether she would have earned the same amount of money as the average American male at the age of 25 years, what her job would have been, and whether she would have worked steadily during that period. We conclude that no reasonable person would, in the ordinary affairs of life, act upon the astronomical projections and assumptions made by plaintiffs' expert and accepted by the district court. The award for impairment of Terri's earning capacity is consequently clearly erroneous.

## C. FUTURE MEDICAL EXPENSES

 The trial judge's allowance of $600,000 as the present value of future medical expenses to be incurred by Terri is doubly invalid. It is subject not only to the same infirmity described above but is also totally lacking in support in the record.

The parties stipulated that $12,466 had been expended to the date of trial for emergency treatment and the several operative procedures and hospitalizations involved directly with the treatment of Terri's disfiguration. The accident occurred nearly six and a half years prior to the trial judge's first opinion, and Terri had by that time been enrolled in school and even appeared to have been doing well academically. There was no evidence whatever that any sums, however small, had been expended or that treatment had been sought or rendered for any psychiatric problems from which the child might have suffered or would suffer as a result of her trauma. It was, of course, altogether proper for the trial court to receive and to consider the testimony of Terri's mother, father, friends and relatives and acquaintances concerning the impact upon her personality of the dreadful accident. With respect to psychiatric treatment, however, the only evidence of its value and need came not from a treating physician but from a psychiatrist whose opinion was based solely upon data he was furnished concerning the child, and upon an interview which occurred shortly before trial and lasted only one-half hour. Based upon that type of proof, the testifying psychiatrist estimated that Terri would require between $8,000 and $10,000 a year for the rest of her life to cover the cost of psychiatric care. Once more the capabilities of computer printouts were enlisted to project future needs based upon the psychiatrist's testimony and upon estimated increases in the cost of psychiatric care until, by a compounding process similar to that employed to predict lost wages, the total dollar amount of estimated future medical expenses based upon a life expectancy of slightly over 70 years would come to $6,179,487.73. Since the undisputed medical testimony was that any future surgical re-

vision of Terri's scars would be minimal and that her physical condition was relatively stable except for some changes on account of growth, see 395 F.Supp. at 1094, the estimated figures were based solely upon the projected need for psychiatric treatment of a girl who had, after seven years, never received any at all. The $6,000,000 figure for medical expenses was based upon computerized projections of increases in the estimated cost of psychiatric care, and included estimates that Terri's psychiatric needs in the last full year of her life would come to $292,136.42. According to the testimony of the plaintiffs' experts, the present value of an award for that type of compensation was $890,194.37. The court's consideration of this figure led it to reduce the award for medical expenses to $600,000.

In our firm view such a conclusion must be viewed as clearly erroneous upon the proofs present.[12] The award of such a sum for future psychiatric care is purely conjectural even though, when viewed with an abundance of caution, the evidence might suggest that at least some allowance should be made for future psychiatric and counselling needs.

### D. PUNITIVE DAMAGES

■ In their cross-appeal, the plaintiffs claim that the trial judge erred in failing to award punitive damages. It is apparent that the trial judge's decision not to award punitive damages was based upon considerations of both law and fact. Citing *Marr v. Rife*, 503 F.2d 735 (6th Cir. 1974), and *Wood v. Stark Tri-County Building Trades Council*, 473 F.2d 272 (6th Cir. 1973), the trial court observed that "[a]s a general rule punitive damages are disfavored in the law absent evidence of willful or wanton conduct by the defendant or the clear need for the imposition as a deterrent." 395 F.Supp. at 1098.

On the other hand, the plaintiffs cite *Gearhart v. Angeloff*, 17 Ohio App.2d 143, 244 N.E.2d 802, 804 (1969), for the proposition that punitive damages may be recovered where a person demonstrates "reckless indifference to the rights and safety of others." The Ohio Supreme Court more recently has discussed the issue in *Gearhart* in *Ranells v. City of Cleveland*, 41 Ohio St. 2d 1, 321 N.E.2d 885, 887 n.2 (1975), observing:

> Traditionally, punitive damages have been allowed only in cases involving specific statutory provisions or intentional acts of wrongdoing. Such recoveries have become commonplace in actions involving assault and battery, wrongful arrest, false imprisonment, alienation of affection or criminal conversation, libel or slander, invasion of privacy, conversion, and other wrongs of a similar nature. 16 Ohio Jurisprudence 2d 179, Section 156. However, our research fails to disclose a case in which this court has awarded punitive damages for alleged wanton misconduct, and only one case in which an Ohio Court of Appeals has done so.

The Ohio Supreme Court went on to observe that *Gearhart* involved the negligent firing of a gun in a crowded bar injuring an innocent bystander, and the fact that the Court of Appeals for Summit County "noted that intentional wrongdoing or other outrageous conduct, would support an award of punitive damages." *Ranells, supra,* 321 N.E.2d at 887 n. 2.

In another Ohio diversity case, *Gillham v. Admiral Corp.*, 523 F.2d 102 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976), our court ordered reinstatement of a United States District Court jury award of punitive damages, citing with approval the following statement from *Columbus Finance, Inc. v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654, 658 (1975):

> [I]ntentional, reckless, wanton, wilful and gross acts which caused injury to person or property may be sufficient to evidence

---

12. The trial judge's opinions reveal that he may have ignored the gross figures testified to by the expert and may have based his calculations simply upon a flat rate of $10,000, holding that the increases in the cost of medical care were offset roughly by the discount factor in reducing the future costs to a present fixed sum. *See* 395 F.Supp. at 1096; 413 F.Supp. at 839 & n.1.

that degree of malice required to support an award of punitive damages in tort actions.

In denying punitive damages, the trial judge relied at least in part upon evidence of improving industry practices to support his conclusion that such damages were not called for as a deterrent to future misconduct. The district court noted that Jiffee had been acquired by Clorox Corporation and that the new management demonstrated greater concern for the consuming public and had "successfully purged" itself of any pre-existing misconduct. 395 F.Supp. at 1098. Further, the trial court characterized plaintiffs' arguments in favor of punitive damages as "more shrill than persuasive." *Id.* at 1097. We conclude that he did not err in his understanding or application of Ohio law and that the trial court did not commit reversible error in denying punitive damages under the circumstances. *See* Rule 52(a), Fed.R.Civ.P.; *Gillham, supra,* 523 F.2d at 103.[13]

### IV. MODIFICATION OF THE JUDGMENT

■ It has often been held that mere difficulty of assessing damages should not preclude an award where the fact of injury clearly appears and certain elements of damages are capable of no precise calculation. *E. g., Palmer v. Connecticut Ry. Co.,* 311 U.S. 544, 560–62, 61 S.Ct. 379, 85 L.Ed. 336 (1941). In such circumstances the precise amount is necessarily left to the discretion of the finder of fact, to be exercised reasonably and within the range of the proofs in the case. *See Howard v. Green,* 555 F.2d 178, 182–83 (8th Cir. 1977). These admonitions are especially important where, as here, it is apparent that the minor plaintiff was grievously injured and where those injuries will cause her much suffering, grief, and humiliation throughout the re-

mainder of her life. We do not doubt that some cases may exist which are capable of a more precise calculation as, for example, where the victim is older and where his or her habits and earning capacities and style of living are better established. *See, e. g., Petition of United States Steel Corp. (II),* 479 F.2d 489 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973), and the specific computations of awards made by this court therein. Terri Drayton's tender age makes an award of damages to her for future losses particularly difficult and almost inevitably somewhat speculative.

■ We adhere generally to the view that where, in a bench trial, an award of damages is found to be excessive, the preferred course is to refer the case back to the court which originally tried it for reconsideration. *See, e. g., Traylor v. United States,* 396 F.2d 837, 840 (6th Cir. 1968), *appeal after remand,* 418 F.2d 262 (6th Cir. 1969); *New York, C. & St. L. R.R. Co. v. Niebel,* 214 F. 952, 957–58 (6th Cir. 1914). At the same time:

> If the issue of damages was tried by the court, there is clearly no constitutional problem concerning the appellate court's power over the court's award of damages. Where the trial court's findings as to damages are clearly erroneous, so that they may properly be set aside under Rule 52(a), the appellate tendency is to order a new trial as to damages, unless the plaintiff remits a stated amount, although we believe that this is not necessary and that the appellate court may itself order judgment in a stated amount where the record is sufficient for that purpose.

6A Moore's Federal Practice ¶ 59.05[3] at 59–68 (1973) (footnotes omitted), cited with approval both in *Morvant, supra,* 570 F.2d at 632, and *Bach, supra,* 502 F.2d at 1122.

---

**13.** The dissent would hold that the trial judge was compelled upon the facts here to award punitive damages, relying upon *Gillham v. Admiral Corp., supra.* We believe such reliance is misplaced. *Gillham* stands for the proposition that under Ohio law, a products liability claim, if linked to sufficiently egregious conduct, will support an award for punitive damages. The issue on appeal is not whether the facts here are as compelling, as suggested by the dissent; rather it is whether the evidence is sufficient to submit the issue for resolution by the trier of facts. Here we uphold the trial judge's finding in that capacity. There is no indication that we would have upset an opposite finding by the jury in *Gillham. See* 523 F.2d at 109.

In *Petition of United States Steel II, supra,* our court, having previously remanded the case to the district court for a recomputation of damages either because they were considered excessive or there was uncertainty as to the factual support thereof,[14] declined to order a second remand for further correction, where it appeared that the district court failed to comply with the terms of the court's first opinion and remand order. *Petition of United States Steel II* also noted that where a case is not remanded to the district court to correct an excessive judgment, the court of appeals has only limited power to modify the award:

> There is no question of this Court's inherent ability to modify a district court judgment and enter a final order thereon. As provided in part by 28 U.S.C. § 2106:
>
> > "The Supreme Court or any other court of appellate jurisdiction may . . . modify . . . any judgment, decree or order of a court lawfully brought before it for review. . . ."
>
> However, a question arises relative to the appropriate scope or standard for the modification of the District Court's findings with respect to damages; i. e., whether this Court can independently determine the appropriate amount of damages or whether it is constrained under the "clearly erroneous" standard for review.
>
> \* \* \* \* \* \*
>
> Clearly, . . . this Court is restricted to the "clearly erroneous" rule.
>
> Therefore, in modifying an award entered by the District Court, this Court cannot merely exercise its independent judgment as to the proper damages, but can only modify to that maximum amount of damages which could have been awarded by the district court without constituting reversible error.

479 F.2d at 500–01 (citations and footnotes omitted).

■■■■ While we are not here faced, as we were in *Petition of United States Steel II,* with a circumstance in which a previous remand had not satisfactorily resolved the problem of damages, the particular circumstances of this case make it a proper one in which to exercise the court's inherent power to modify the judgment recognized in 28 U.S.C. § 2106. With considerable trepidation, we therefore undertake the entire task at this level.

■■■■ In reaching our conclusions, we take into consideration all of the evidence properly before the district court and also its findings of fact, except those which were made in reliance upon the attenuated statistical projections and computer printouts which we have found specifically inadmissible and improper under both *Bach* and *Morvant.* We have also assigned a very minimal value to the psychiatric testimony for many of the same reasons that such similar testimony was rejected altogether in *Petition of United States Steel Corp.,* 436 F.2d 1256 (6th Cir. 1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1699, 29 L.Ed.2d 153 (1971); and 479 F.2d 489 (6th Cir.), *cert. denied,* 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973). As in *Petition of United States Steel,* we recognize that the psychiatrist was consulted solely for purposes of trial testimony and not for treatment. However, we decline to reject that testimony altogether, since the appellant raises the claim of the psychiatrist's disqualification under *United States Steel* for the first time on appeal.[15]

## A. LOSS OF FUTURE EARNINGS

■■■■ In determining any loss of Terri Drayton's future earnings, we take into

---

**14.** *See Petition of United States Steel Corp. (I),* 436 F.2d 1256 (6th Cir. 1970), *cert. denied,* 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

**15.** Whether the rule in *United States Steel* regarding non-treating doctors is altered by new Federal Rule of Evidence 703 is an issue we need not decide here, since the trial in the instant case occurred prior to the effective date of the Rules.

*See also* Fed.R.Evid. 803(4) and Advisory Committee Note thereto; 3 & 4 Weinstein's Evidence ¶ 703[03] at 703–16 to –17, ¶ 803(4)[01] at 803–124 to –125 (1977).

account the evidence that her mental and anatomical capabilities have been unimpaired by the accident and that, therefore, were it not for her severe facial disfigurement, there would be no evidence to support any future loss of earning capacity. At the same time, we have considered, as did the district judge, the testimony of the parents and the witnesses concerning the effect of the disfigurement upon her personality and behavior. We consider also the psychiatrist's testimony concerning persons similarly injured in determining that a substantial impairment in Terri's earning capacity is probable when she enters the labor market upon reaching majority several years hence. We take into account as well her life expectancy and the testimony credited by the trial judge that she might leave the labor market at the age of 60. We have considered as well her sex, her race, the necessarily limited evidence concerning her mental capabilities, and her psychological makeup. We have taken into account the past statistical evidence submitted by the economic experts concerning economic growth, demonstrated past economic growth, and evidence concerning the changes in the cost of living from time to time and the impact of the diminishing value of the dollar. We have also considered the testimony of all of the witnesses concerning the appropriate rates for the discount of those losses which must be compensated for now but which are likely to be incurred with reasonable certainty in the future. While we also acknowledge defendant's statistical evidence showing that blacks and females generally do not presently fully enjoy the benefits of the American standard of living, we recognize the likelihood that these disadvantages will have considerably less impact in the future on the ability of a black female such as Terri to obtain gainful employment comparable to that available to white males. Finally, we have considered the evidence concerning Terri's personality and demonstrated intelligence as bearing upon the improved likelihood that she may attend college and in that way increase her own earning capacity.

We decline to assign a specific figure to any or all of the foregoing values here, where the plaintiff is so young and where of necessity the damages must be set aside for future losses occurring over an extended period of time and into the 21st century. In our opinion, a more reasonable result is achieved by the exercise of a discretion which weighs and balances all of these factors and reaches one stated amount. In our judgment, the award of a present sum of $150,000 is the maximum sustainable amount to compensate Terri Drayton fairly and adequately for the diminution of future earning capacity which she may reasonably expect to suffer because of her injuries, assuming her entry into the labor market upon reaching majority until her withdrawal from it at the age of 60.[16]

## B. MEDICAL EXPENSES

 In *Petition of United States Steel* our court substantially reduced the amount of damages awarded by the lower court, finding that the psychiatric testimony in support thereof was incompetent. *See* 479 F.2d at 495–96, 502–04; 436 F.2d at 1263–71. Since as stated earlier, objection to the admissibility of that testimony here was not timely made in the district court, we consider it but give it relatively little weight. In *Petition of United States Steel I*, the estimated cost of psychiatric care at that time was placed at $30 per hour. 436 F.2d at 1271. Our only testimony here was the "ballpark" figure of Dr. Bernstein, who estimated that psychiatric care would cost approximately $8,000 to $10,000 per year. The witness did not testify how much time would reasonably be required or what this

---

**16.** Thus as an illustration only, $150,000 invested at the modest rate of 5½% per annum compounded annually would increase during the eleven years between Terri's age of 7 and 18 to a sum of approximately $270,000 yielding at that rate thereafter the sum of approximately $14,800, even without any invasion of principal. Of course, future payments should reflect an income interest augmented by principal, so that at the conclusion of Terri's projected working life the principal sum will be fully exhausted.

would entail in terms of consultation. Indeed, the doctor acknowledged that psychiatric treatment would not always be needed. Considering the child's condition, the testimony concerning her reaction to her plight, and the testimony of the psychiatrist concerning the reasonably expected patterns of behavior of persons similarly afflicted, we are loath to reject an award for future medical care altogether. There is at least some testimony that relatively minor revisions in the scarring will be required, which alone would warrant some allowance. In addition, we are reluctant to hold upon the proofs that plaintiff has failed to establish a certain amount of potential future need for psychiatric and counselling services to enable her to overcome the psychological effects of her disfigurement. Contrary to the same claim in *Petition of United States Steel*, plaintiff's condition is real and abiding, and there can be no suggestion that her reaction to her condition is in any way contrived. Based upon Dr. Bernstein's testimony, it also appears that if psychiatric care is required at all in the future, it is likely to come during the period of puberty and during the age when the plaintiff would normally be expecting to enter the labor market and to expand her social horizons beyond the confines of her immediate home, as ultimately she must. We assume that the doctor's estimate of $8,000 and $10,000 per year in psychiatric care is for concentrated treatment. Except for a relatively brief time during adolescence, the proofs fail to demonstrate with reasonable medical certainty that anything like that amount can be reasonably anticipated, either in the present or in the future, or with any regularity. Taking this into consideration and taking into account the same discounting considerations which have been made in our modification of the award of damages for impairment of earning capacity, we conclude that a sum of $30,000, prudently invested, will yield a sum fairly and reasonably adequate to compensate for any reasonably anticipated expenses for future medical and psychiatric care and treatment. Of this sum, we conclude that $15,000 should be awarded directly to the mother to compensate her for the care she must provide during Terri's minority and that the balance should be awarded to Terri. This division, while ostensibly equal, recognizes that the sums payable to the mother will necessarily be expended within the next few years, and that the sum reserved for Terri is subject to a substantially greater discount, because it will not be drawn upon until Terri reaches majority and because it will continue to finance her medical expenses for, perhaps, a substantial period of time thereafter.

In making this revision, therefore, the sum of $15,000 should be awarded directly to the mother, Bernice Drayton, who is also entitled to an award of $12,466 for medical expenses incurred to the time of trial.[17]

## C. LOSS OF SERVICES

■ Since there was no evidence that Terri's injuries rendered her incapable of performing household tasks for her mother during the period of her minority, we cannot uphold that portion of the $20,000 award to Bernice Drayton which exceeded $12,466 and was found by the court to be reasonable compensation for that element of loss. The award for this element of damage was, therefore, clearly erroneous.

## D. PAIN AND SUFFERING

■ No element of Terri Drayton's damages is so certain to persist in the future as the pain and suffering which she is bound to experience over the rest of her life as a proximate result of her facial disfigurement, however she may seek to alleviate the physical and psychological effects of that condition. Her loss, though extraordinarily difficult to translate into dollars, is by every measure substantial. Although of

---

17. We reject defendant's assertion that the negligence of the father, Henderson, forecloses the claim of the mother, Bernice Drayton, who was free from fault. Under Ohio law, the negligence of each parent is considered independently in determining whether either or both are entitled to recover damages for the injury of their child. *See Cleveland, C., C. & St. L. Ry. Co. v. Grambo*, 103 Ohio St. 471, 134 N.E. 648, 650 (1921).

admittedly little value, we have considered the range of awards given in other cases for what appear at least to have been relatively similar types of injuries. *See Petition of United States Steel II*, 479 F.2d at 501. We are frank to admit that we have found no Ohio case upholding an award of $500,000 where the injury was solely cosmetic and not functional. At the same time we have found no case in which the actual disfigurement was so extensive. In no other element of damages is there so wide a latitude for awards as in pain and suffering, in view of the individual circumstances of the victims.

Upon a careful reflection and considering as did the district court that Terri was 1.01 years of age at the time of the accident and then had a remaining life expectancy of 70.39 years, and that her affliction in this regard can be reasonably expected to extend over that entire period of her life, we are unable to find that the trial judge's award of $500,000 was clearly erroneous.

## V. CONCLUSION

Numerous other specific claims of error are raised by the appellant before us aside from those discussed above, all of which we have carefully considered. Most of those errors went to matters which were within the discretion of the trial judge in presiding over a difficult nonjury trial. In many instances, we would readily conclude that that discretion might have better been exercised differently, but in none of them are we sufficiently persuaded that its exercise was so arbitrary as to warrant a new trial. Many alleged errors are, in any event, rendered harmless because of our more limited holding as to the extent of liability here. Other alleged errors, we believe, will be satisfactorily cured by reforming the judgment.

Accordingly, the judgment of the district court is modified as set forth in this opinion as follows:

| | |
|---|---|
| To Terri Drayton, the sum of: | $665,000 |
| To Bernice Drayton, the sum of: | 27,466 |

Interest shall attach to the awards as of the date of the district court judgment on May 19, 1976. *See Petition of United States Steel II*, 479 F.2d at 508. No costs are taxed, no party having prevailed in full.

KEITH, Circuit Judge, concurring in part and dissenting in part.

While I fully agree with the majority's holding that the defendant was in breach of its express warranty and with the majority's affirmance of the district judge's award of $500,000 for Terri Drayton's pain and suffering; I respectfully dissent from its disposition of the future earnings, psychiatric treatment and punitive damages issues.

I agree with the majority that the evidence as to future loss of income has some troubling features. The problem is obvious; Terri Drayton was only one year old at the time of her injury. No one knows with any certainty what her earning capabilities would have been. However, nothing in the majority opinion convinces me that its determination is any better than the district judge's. In light of the ogreish conduct which took place here, and of the district court's earnest efforts to deal with the loss of future income problem, I would affirm that part of the judgment as not clearly erroneous and within the bounds of discretion.

The danger of appellate fact finding is well demonstrated by the majority's handling of the damages award for future psychiatric treatment. The majority discounts the psychiatric testimony on two grounds. First, because the testimony did not come from a treating psychiatrist, but from a psychiatrist whose opinion was based upon data he received concerning the child, and who had only interviewed the child at most a half hour. Second, the majority appears to be greatly influenced by the apparent fact that as of the date of trial, Terri Drayton had not received any psychiatric treatment.

At the time of trial Terri Drayton was seven years old. The fact that she had not yet received psychiatric treatment says nothing about her need for it in the future. While it is true that great strides have been

made in child mental health, psychiatric treatment of children is still difficult. Further, psychiatrists have long recognized that counseling a maimed seven year old's parents is as important as counseling the seven-year old herself. Terri Drayton's parents may well have decided not to subject themselves and their daughter to treatment out of fear, ignorance or a reasoned decision to postpone therapy. Further, for all we know, Terri Drayton has not received psychiatric treatment because her parents cannot afford it. I would not hold her parent's possible penury or ignorance against her to minimize her future needs.

Similarly, the fact that the psychiatric witness saw Terri for only one half hour, and relied extensively on information given him about Terri, is irrelevant. One does not take a seven-year old child, put her on a couch and proceed to diagnose her. An adult can tell a therapist what is wrong, a child speaks to a psychiatrist largely through its behavior. Plaintiff's witness in this case, Dr. Norman Bernstein of Harvard, is a leading authority on disfigured children and their psychiatric problems. A review of Terri's medical records, interviews with her family, followed by a brief meeting with the child herself was ample basis for his testimony.[1]

Although the majority opinion correctly outlines the facts of this case, words cannot describe the shocking appearance of the child. The Liquid-plumr has horribly mutilated this little girl for life. There exist very real grounds for the trial judge's award of damages for her future psychiatric needs. This case is plainly unlike *Petition of United States Steel Corp. (I)*, 436 F.2d 1256, 1265 (6th Cir. 1970), where Judge Peck noted the flimsy and self-serving basis of the psychiatric testimony there. Here, the expert psychiatrist's testimony was soundly based. I see no exaggeration in this record; one can readily perceive the severe problems this child will have coping with our acutely appearance-conscious society.

The majority agrees that some psychiatric treatment is needed because it awards Terri $30,000 for such treatment. However, if the testimony in the record is as bad as the majority makes it out to be, then no basis exists for its award either. It is difficult for me to understand how the majority can attack the testimony in the record, proceed to make the unsupported lay diagnosis that Terri Drayton will not need concentrated psychiatric treatment, and then arrive at a figure of $30,000 to compensate her for any treatment she does need. If the majority is unhappy with the psychiatric testimony, the prudent course of action to take would be to remand for further proceedings at the trial level. Since I am of the view that the original award was not clearly erroneous, I would affirm it in full.

Finally, I disagree with the majority's determination of the punitive damages issue. The district court denied punitive damages on the grounds that 1) they were not available as a matter of law and 2) they should be unavailable in the exercise of discretion on the facts of this case. The trial court's threshold determination that punitive damages were unavailable was made without the benefit of this court's decision in *Gillham v. Admiral Corporation*, 523 F.2d 102 (6th Cir. 1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1113, 47 L.Ed.2d 318 (1976), and cannot survive that decision.

The majority affirms the judgment of liability on the narrow ground of breach of express warranty, and then goes on to conclude that denial of punitive damages was not an abuse of discretion. The majority does not reach the Strict Liability issue, fearing that to find that this product was properly labeled, but unreasonably dangerous, is to judicially ban it from the marketplace.

I am at a loss to explain the majority's reluctance to squarely hold to this effect. The evidence is clear that regardless of

1. Notably absent from the majority opinion is any citation of psychiatric authority. Even a cursory examination of such authority reveals the majority's mistaken assumptions. *See*

Gardner, Psycotherapeutic Approaches to the Resistant Child (1975); Kanner, Child Psychiatry (1957).

labeling,[2] this product was unreasonably dangerous *for intended use* —that is, household use. The Liquid-plumr with the old 30% formulation could have been marketed—with proper warnings—for professional use. The Jiffee Corporation made a conscious decision to market this product to the bigger—and more profitable—consumer market. This should not have happened,

**2.** While I believe that *no* label would be adequate, I note that a label which states "Danger, causes severe burns" is not the equivalent of a label which states "Danger, causes severe, irreversible burns, first aid is of minimal value."

**3.** THE COURT: Proceed.

By Mr. Swartz:

Q Mr. Summerfelt, you started with Clorox when, just for the record, so we can get a frame of reference.

A October 25, 1969.

Q And immediately, you undertook the duties that you described with respect to a product called Liquid-plumr?

A Yes.

Q And incident to those duties, you reviewed the practices of the Jiffee Corporation which have now been acquired by Clorox, did you not, with respect to its manufacture, testing, suitability of the product, et cetera?

A Well, as well as we could, yes.

Q And you learned, did you not, to save time, that in the 15 years, approximately, that Jiffee Corporation was manufacturing Liquid-plumr, they had no research and development program?

A Yes, not to my knowledge.

Q And you also learned that in those 15 years, they conducted no tests on the formulation with a view toward reducing its causticity?

A. Not to my knowledge.

Q Now, Mr. Summerfelt, to save time, I'm sure you have reviewed it. You gave a speech that has now become famous. You know which one I'm referring to; correct?

A I think so.

Q And what am I referring to, your famous speech that you told about the properties of old Liquid-plumr?

A Yes.

Q Mr. Summerfelt, to save time, I'm going to read to you a quote from that speech. That was given to you previously. This is quoting from you.

It said, "Old Liquid-plumr was a hazardous product. It said right on the label that it causes severe burns on contact."

I'm still quoting.

"That means if old Liquid-plumr was accidentally ingested or splashed in the eye or on the skin, it could cause severe, irreversible damage and first aid was of minimal value."

Is that your statement there?

A Yes, it is.

Q And that is still true today with respect to the old formulation; correct?

A Yes.

Q Now, you found when you took over this Liquid-plumr project—and you recall you gave a previous deposition in another case, and please forgive me. I'm going to try to save time by condensing it.

You found the Liquid-plumr, the old formulation, to be ineffectual and that is why you looked for a new formulation; correct?

A Yes, ineffectual on the grease.

Q For the general purposes sold, you found that for some of its major applications, it was ineffectual; correct?

A Yes.

Q In addition to finding that the old Liquid-plumr formulation was ineffectual, you were concerned, as you say right in the patent, with the problem of safety?

A Oh, yes.

Q In other words, you wanted to find some way, if possible, to reduce the causticity of the product if you could while increasing its effectiveness; correct?

A Yes.

Q And you did this primarily by using a potassium hydroxide solution in water, basically, in layman sense; is that correct?

A All right. Yes.

Q Now, potassium hydroxide was a well-known chemical known to chemists for hundreds of years; correct?

A Yes.

Q And potassium hydroxide is 30 percent, approximately, less caustic than sodium hydroxide, approximately; is that not right?

A Yes. It is less alkaline.

Q So the new Liquid-plumr solution had approximately 5 percent potassium hydroxide in it; is that correct?

A. Yes.

Q And if you had reduced that by 30 percent, you got about a 3 percent causticity factor as compared to the old sodium hydroxide if we are using 5 percent sodium hydroxide; correct?

A. Yes.

---

the product was inherently too dangerous for that market. This is not my conclusion, it is the conclusion of the *defendant's* witness, Vernon Summerfelt who, as manager of specialty products for the Clorox Company, supervises the current sale of (reformulated) Liquid-plumr. The stunning cross-examination of Mr. Summerfelt deserves reproduction in full.[3]

This product squarely falls within the following language by two leading products liability commentators:

"Sometimes the product is so inadequate that the defect cannot be remedied by instructions or warnings. Some drugs, for example, prove to have such grave side effects that they must be completely withdrawn from the market. Likewise if machinery is so designed that it is likely to give way under strains reasonably to be expected, a mere warning of the weakness, as distinguished from its correction, ordinarily will not prevent the product from being classed as dangerously defective. This may happen even though the warning to the purchaser might be emphatic enough to preclude his recovery because of his contributory negligence or voluntary assumption of risk. Inadequacy regardless of warning may also be claimed if a dangerous product is likely to be used or misused by children, especially if the danger can be reduced by improved design or manufacturing methods." Noel and Phillips, *Products Liability,* p. 160 (West, 1974).

As the Restatement of Torts 2d § 291 points out, tort law involves a careful weighing process. On balance, does a product's utility outweigh the risk created by its use? The answer here is clearly that it does not. Unlike the lifesaving but unavoidably dangerous drugs mentioned in the Restatement of Torts 2d § 402A, comment k; the old Liquid-plumr was a mere household convenience. Further, as Mr. Summerfelt admitted, the product could have been—and later was—reformulated to be both safer and more effective. Whether styled as a design defect or as a failure to warn, this

Q And one of the reasons that you immediately, as soon as you got the problem, engaged in this research and development program which never existed with respect to this product prior thereto was that you were concerned about consumer protection and consumer safety, were you not?

A Also the consumer ads, substantiation, my own professional pride.

Q And a major part of it was your desire and your company's desire to protect consumers from foreseeable circumstances of harm?

A That was one part. It was really a two-pronged thing.

Q There were other parts; right?

MR. MULLIGAN: Let him finish.

Q Was that at least one major part?

A. That was one of them, yes.

MR. MULLIGAN: May the witness finish the answer?

THE COURT: Yes.

Q What is the other part?

A The other part, as previously mentioned, was to approve [sic] the efficacy.

Q Yes. And the third reason, was it not, was at this time the Food and Drug Administration, as you indicated in your deposition, was getting very interested in this problem and you were aware, based upon your conversations and correspondence—I say "you." The corporation was—of their interest in reducing causticity and changing the packaging of the old Liquid-plumr formulation?

A That really didn't take effect till late '70.

Q So your efforts in the area of consumer protection and consumer safety here with respect to this area really, and admirably so, preceded the efforts of the Food and Drug Administration?

A Yes.

Q You found, as testified to previously, interestingly enough, that lesser concentrations of a caustic for the general purposes for which Liquid-plumr was sold would do a better job, as you indicated, a more effectual job, than the higher concentrations; correct?

A On the grease mainly. Not so much for the hair.

Q But generally speaking that is true, correct?

A Yes.

Q And not only would it do a better job from the point of view that you just described, it was a far safer product, was it not?

A It was certainly going in the right direction.

Q Yes. You would like to go a little beyond, but certainly far safer when you compare it to the 30 percent sodium hydroxide; correct?

A. Yes. It was safer than that.

Q Very little more, sir.

You were asked a question—and this may be my last question. You were asked a question that based on your training and experience and the work you did in research and development, do you agree with the conclusion of the Government that liquid drain cleaners, including the old Liquid-plumr, should be banned as a hazardous substance under the "Banned Hazardous Substance Act," and at that time your answer was yes. Is that still your answer?

A Yes.

product's shortcomings were such that liability should clearly attach. *See Barker v. Lull Engineering Co.,* 20 Cal.3d 413, 143 Cal.Rptr. 225, 573 P.2d 443 (1978); *Cepeda v. Cumberland Engineering Co.,* 76 N.J. 152, 386 A.2d 816 (1978); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825 (1973); Keeton, *Product Liability and the Meaning of Defect,* 5 St. Mary's L.J. 30 (1973). *See also* Phillips, *The Standard for Determining Defectiveness in Products Liability,* 46 U.Cin.L.Rev. 101 (1977). *See generally* Calabresi, The Costs of Accidents (1970); Fletcher, *Fairness & Utility in Tort Theory,* 85 Harv.L.Rev. 537 (1972).

The evidence in the record that defendant marketed this product without bothering to even try to make it safe, and then advertised it as safe despite being aware of its highly dangerous formulation is conduct so egregious as to support an award of punitive damages. The facts here are certainly as compelling as the facts in *Gillham, supra.*[4]

The defendant's callous argument that "only" 59 other Liquid-plumr injuries were reported to the defendant is further proof of the need for punitive damages. It is miraculous that in the 15 years of marketing Liquid-plumr with the old 26–30 percent lye formulation, only 59 injuries came to the defendant's attention. Had Liquid-plumr caused massive injuries to thousands of Americans there is little question that the product would have been banned at once, either by an appropriate federal or state agency ( i. e. the Consumer Product Safety Commission under 15 U.S.C. §§ 1261 *et seq.*), or by special legislation. For reasons unknown, this product did not cause massive disfigurement to large numbers of people. Accordingly, defendant was in the happy position of being able to profitably market a highly dangerous product and simply pay off the few people who suffered severe injury.

The majority's argument that the old formula Liquid-plumr was as safe and effective as other drain cleaners sold at the time, to me, further demonstrates the need for punitive damages. If an entire industry monolithically markets a dangerous product instead of competing to make a safer product, the deterrent effect of punitive damages is vitally needed. Indeed, Mr. Summerfelt indicated on direct examination that even today, drain cleaners as dangerous as the old-formula Liquid-plumr are still being marketed. (J.A. at 668).

That the Clorox Company reformulated Liquid-plumr after acquiring the Jiffee Corporation is to be highly commended. However, I would not go overboard, as the district court did, and immunize the successor corporation from punitive damages. The conduct here was too wanton and the need for deterrence and public protection is too great.

Punitive damages are needed in cases such as this to put lawless corporations on notice that profitable but highly dangerous products cannot be marketed in the expectation that they will cause injuries to a few persons who can be cheaply compensated. It is only when the profit is taken out of the manufacture of hazardous substances that future horrifying injuries such as the one here can be averted. *See* Owen, *Punitive Damages in Products Liability Litigation,* 74 Mich.L.Rev. 1258 (1976).

In a society which unfortunately places high value on personal appearance—especially in women—defendant's conduct in marketing this dangerous product has turned a little girl's bright future into that of a withdrawn, terrified leper, doomed to a life of unceasing agony. To be sure, the majority is not insensitive to her plight, but unfortunately, reaches a result which does not adequately compensate her nor adequately deter the wanton corporate behavior which took place.

---

4. In *Gillham,* the manufacturer sold TV sets despite knowing they were a fire-hazard. The company neither redesigned them nor informed the public of the danger, but continued to assert that the TV's were safe.

I would affirm the judgment below in favor of Terri Drayton [5] with the exception of the punitive damages ruling and would remand for determination of punitive damages.

---

5. I concur in the majority's disposition of the mother's claim for loss of services.