Allen, J.
 

 This record presents two questions of legal significance. The first is whether, in case of the arrest of the drawer of a check, upon a warrant issued upon an affidavit sworn out by the payee, after notice given by the bank to the payee that the check is dishonored because there is no account in the name of such depositor with the bank, and after such statement is repeated to the payee by the bank upon an investigation by the bank and the payee, such statement being made by the bank’s employee through mistake or error, but without malice, the arrest of the depositor and his consequent imprisonment is as a matter of law not the proximate result of the act of the bank:
 

 The second question is whether such an arrest and imprisonment of- itself alone constitutes an actual damage.
 

 In order to discuss these questions, it will be necessary to consider the facts as shown by the record.
 

 The plaintiff gave some evidence in favor of the
 
 *602
 
 allegations of his petition, and indeed the defendant concedes the following facts:
 

 The depositor opened his account at the bank on April 9, 1924, signing his name on the identification card in a form which was read “Meuse.” The account was hence opened in the name of “G. O. Meuse,” and so written in the deposit book received by the depositor at the time. Two later deposits were made by Mouse, prior to his arrest, and prior to the return of the two checks in question. These two checks were signed “G. C. Mouse.” Prior to issuing these checks, Mouse signed a card authorizing his wife to draw checks upon his account, in which the name of the account is called “Mr. and Mrs. G. C. Meuse,” but the signature of Mouse was written “G. O. Mouse,” the wife’s signature was written “E. Mouse,” and the wife’s name also appeared “Mrs. G. O. Mouse.” Hence the bank records contained three entries where the name, was written “Mouse,” and this upon a card headed “Name of Account: Mr. and Mrs. G. C. Meuse.”
 

 On June 13, and again on June 17, 1924, Mouse gave his wife checks which she cashed with Elias Cory. It is conceded that at all times Mouse had sufficient money in the bank to meet the checks so issued. The bank charged Cory’s account with the first check, and notified Cory that the check was not good when he presented the second check for credit, stating that the account was closed. Cory went to the bank and personally interviewed the bookkeeper. The two looked for the signature on the books, but failed to locate the correct name. Several days later, Cory went to the police court and filed an affidavit, charging Mouse with issuing checks without
 
 *603
 
 funds. A warrant was issued upon this affidavit, and Mouse was arrested and thrown into jail until released upon bond. The bank, upon learning of the arrest, and discovering the facts respecting Mouse’s account made immediate payment of the checks, and procured Mouse’s release from prison by having an officer of the bank sign his bond for that purpose. The charge was dismissed.
 

 Since the bank was in possession of a card signed “G-. Mouse,” and “E. Mouse,” as well as the one which was read “GL C. Meuse,” there was some evidence of negligence upon the part of the bank; but the court directed a verdict upon the ground that there was no evidence that the act of the bank caused the arrest of the plaintiff.
 

 The majority of the court disagree with this conclusion. There was evidence, in the record tending to show, in our opinion, that the act of the bank was the causative factor in the entire transaction. The very gist of the prosecution was the nonpayment of the check. If at any time prior to the institution of the prosecution the bank had notified Cory of its mistake, eoncededly Cory would not have sworn out the affidavit and caused the warrant to issue. This is not the case in which the negligence of the bank was a mere condition upon which the independent act of Cory intervened to produce the result. The case is differentiated from the
 
 Hartford case,
 
 170 Cal., 538, 150 P., 356, L. R. A., 1916A, 1220, which we discuss below, by the fact that Cory deliberately consulted with the bank, looked over its books with the bookkeeper, and made a searching investigation before he instituted the prosecution. Hence evidence was presented tending to show that the act
 
 *604
 
 of Cory was under the control of the bank, in the ■sense that if its bookkeeper had carefully compared the entire records, and had observed the name “Mouse” plainly written in at least three places on the records of the bank, it would have been evident that Mouse had an account with the depositary, and the arrest would have been stayed.
 

 This case is entirely dissimilar from the familiar case in which the delay in the delivery of goods is caused by a tort-feasor, and while the goods so delayed are in transit, or on the water, they are injured by some tempest. In such a case, if there had been no delay, the tempest would have occurred exactly as it did occur, and hence the tempest is an independent intervening cause. In this case, however, if the bank had at any time notified Cory of its mistake, he would not have sworn out the affidavit. There would have been no arrest if the bank had not reported that the two checks were not good, and persisted in that report upon consultation with Cory. Hence there is some evidence to the effect that the connection of the bank with the transaction is more than that of merely being a remote factor in the process by which Mouse was wrongfully arrested and confined in the county jail. Reasonable minds might conclude as a matter of fact from this record that the bank’s act, even though entirely without malice, stimulated and instigated Cory to procure the arrest. This is particularly true under our Code, Section 710-176 of which provides as follows:
 

 “Any person, who, with intent to defraud, shall make or draw or utter or deliver any check, draft or order for the payment of money upon any bank or other depository, who, at the time thereof, has
 
 *605
 
 insufficient funds or credit with such hank or depositary, shall be guilty of a felony, and upon conviction thereof shall be fined * * * or imprisoned in the Ohio state penitentiary * * *.
 

 “As against the maker or drawer thereof, the making, drawing, uttering or delivering of a check, draft or order, payment of which is refused by the drawee, shall be
 
 prima facie
 
 evidence of intent to defraud, and knowledge of insufficient funds in, or credit with, such bank or other depository.”
 

 This section has been construed and strictly applied in the case of
 
 State
 
 v.
 
 Lowenstein,
 
 109 Ohio St., 393, 142 N. E., 897, 35 A. L. R., 361.
 

 In view of these provisions, it was entirely natural and probable that the act of the bank would result in the arrest of Mouse. By the exercise of reasonable diligence, the bank could have foreseen that this exact consequence would occur, for the issuance of a check upon a bank without funds or credit to meet it is a public offense, which, notoriously, frequently results in the arrest and imprisonment of the drawer of the check. As said in
 
 Siminoff
 
 v.
 
 Jas. E. Goodman & Co. Bank,
 
 18 Cal. App., 5, 121 P., 939, when the bank returned the check to the payee with the indorsement “No funds,” the act at once suggested a possible violation of a penal statute punishable as a felony.
 

 An excellent discussion of the question whether an act, although in fact negligent, would have resulted in the injuries complained of, had it not been for the intervention of an independent cause, is to be found in 22 Ruling Case Law, 132 to 135. We quote one paragraph of this authority:
 

 “It is universally agreed that the mere fact that
 
 *606
 
 the intervention of a responsible human being can be traced between the defendant’s wrongful act and the injury complained of will not absolve him. On the contrary the general rule is that whoever does a wrongful act is answerable for all the consequences that may ensue in the ordinary course of events, though such consequences are immediately and directly brought about by an intervening cause, if such intervening cause was set in motion by the original wrongdoer, or was in reality only a condition on or through which the negligent act operated to produce the injurious results. Any number of causes and effects may intervene between the first wrongful cause and the final injurious consequence; and if they are such as might, with reasonable diligence, have been foreseen, the last result, as well as the first, and every intermediate result, is to be considered in law as the proximate result of the first wrongful cause. The question always is: Was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise.”
 

 It is certainly the general rule, as stated in the same authority, that
 
 “a
 
 person’s liability for his acts depends upon their tendency under the circumstances known to him. * * * Fault on the part of the defendant is to be found in action or non-action accompanied by knowledge, actual or implied,
 
 *607
 
 of the probable results of his conduct. ’ ’ 20 Ruling Case Law, 11.
 

 As stated in Pollock on Torts (7th Ed.), 34:
 

 . “For, although we do not care whether the man intended the particular consequences or not, we have in mind such consequences as he might have intended, or, without exactly intending them, contemplated as possible. * * * This is the limit introduced by such terms as ‘natural’- — or more fully ‘natural and probable’ — consequences.”
 

 Thus in the case of
 
 Guille
 
 v.
 
 Swan,
 
 19 Johns. (N. Y.), 381, 10 Am. Dec., 234, the descent of a balloonist, which attracted a crowd of people into the garden of the plaintiff, which broke down the vegetables and flowers, was held to be the proximate cause for all that was done by the crowd. The court said:
 

 “If his descent, under such circumstances, would, ordinarily and naturally, draw a crowd of people about him, either from curiosity, or for the purpose of rescuing him from a perilous situation, all this he ought to have foreseen, and must be responsible for.”
 

 It is the general rule “that, to constitute one act the proximate cause of another, it is not essential, according to the great weight of authority, that the supposed effect should have resulted of necessity from the act — in other words, have been inevitable. * * * Events of causative influence may intervene between the initial act and the final result, without displacing the initial act from the position of proximate cause, if the intermediate events themselves were natural sequences of the initial act.”
 
 Lawrence
 
 v.
 
 Heidbreder Ice Co.,
 
 119 Mo. App., 316, 93 S. W., 897.
 

 
 *608
 
 It is also a well-established rule of law that a defendant may be held responsible, even if the casualty was not the result of his sole negligence, but was caused by his negligence concurring with that of another, or any other independent intervening cause.
 
 Thompson
 
 v.
 
 City of Slater,
 
 197 Mo. App., 247, 193 S.
 
 W.,
 
 971;
 
 Brennan
 
 v.
 
 City of St. Louis,
 
 92 Mo., 482, 2 S. W., 481;
 
 Thompson
 
 v.
 
 Louisville & Nashville Rd. Co.,
 
 91 Ala., 496, 8 So., 406, 11 L. R. A., 146;
 
 Farnon v. Silver King Coalition Mines Co.,
 
 50 Utah, 295, 167 P., 675, 9 A. L. R., 248.
 

 The defendant in error cites certain cases, notably decisions from California, counter to this holding. In the case of
 
 Hartford
 
 v.
 
 All Night and Day Bank,
 
 170 Cal., 538, 150 P., 356, L. R. A., 1916A, 1220, however, at the time the plaintiff drew his check he had on deposit in the savings department of the bank the sum of $25. It was a rule of the bank that it was not bound to make payment upon any savings account unless the passbook was presented. The plaintiff drew an ordinary commercial check in the sum of $10 in favor of himself, which was returned with the notice, “Has no account.” The record showed that the bank’s attention was never called to the fact that an ordinary commercial check had been drawn, which the plaintiff expected would be paid out of his savings account. The principal discussion of the case centers around this fact, the court questioning whether under the circumstances it can be said that the bank was negligent at all. This holding was later followed in
 
 Bearden
 
 v.
 
 Bank of Italy,
 
 57 Cal. App., 377, 207 P., 270, a case which evidently involved the refusal of the bank to pay a check upon a commercial account. In this case it
 
 *609
 
 is true that the payee notified the bank that he would cause the arrest of the drawer; thus calling to its attention the probable consequences of its refusal to pay the check.
 

 In the case of
 
 Waggoner
 
 v.
 
 Bank of Bernie,
 
 220 Mo. App., 165, 281 S. W., 130, the court states that the natural consequence to be expected from refusal of payment of the check was that the payee would immediately notify the plaintiff of its dishonor and demand payment. The court comments that arrests are not usually made without investigation, and then follows the doctrine of the
 
 Hartford case.
 

 It does not appear in most of these cases what are the statutes of the particular jurisdictions, nor that they are identical with our own. Since Section 710-176, above quoted, specifically makes the refusal of the check
 
 prima facie
 
 evidence of intent to defraud, which is an essential element in the crime defined in the preceding paragraph, the bank has notice that its refusal to pay the check is apt immediately to suggest criminal prosecution. The mere fact that an intervening party actually swears out the affidavit, upon which the warrant of arrest is founded, does not as a matter of law break the chain of causation. Reasonable minds .might conclude, under such circumstances, that the swearing out of the affidavit is predicated upon, stimulated and instigated, and thus actually caused, by, the failure of the bank to pay the check. This is peculiarly true in the instant case, where the bank, upon investigation in good faith by the payee, persisted in the statement that the checks were not good.
 

 The question next arises as to whether, conceding the arrest, and the fact that there is evidence tend
 
 *610
 
 ing to show that the arrest is caused by the act of the bank, the plaintiff has failed to make out a cause of action, because he has alleged no other damage than the arrest, confinement in jail, and the humiliation consequent thereon.
 

 The trial court apparently had in mind Section 710-132, General Code, when it made the ruling that “no special damages are alleged, so none can be proven.” This section reads as follows:
 

 “No bank shall be liable to a depositor because of the nonpayment through mistake or error and without malice of a check which should have been paid unless the depositor shall allege and prove actual damage by reason of such non-payment and in such event the liability shall not exceed the amount of damage so proved.”
 

 What is an actual damage? A careful reading of the statute leads us to conclude that, when the Legislature enacted this section, it did not intend to deprive a depositor of the right of action in case of the nonpayment of his check through error or mistake, and without malice, but intended merely to eliminate speculative and punitive damages in the absence of malice on the part of the depositary. “Actual damages” is a term synonymous with compensatory damages, and covers all loss recoverable as matter of right.
 
 Gatzow
 
 v.
 
 Buening,
 
 106 Wis., 1, 81 N. W., 1003, 49 L. R. A., 475, 80 Am. St. Rep., 1. In the states where punitive damages are recoverable, the,phrase “actual damages” is used in contradistinction to vindictive damages.
 
 Ellis
 
 v.
 
 Brockton Pub. Co.,
 
 198 Mass., 538, 84 N. E., 1018, 126 Am. St. Rep., 454, 15 Ann. Cas., 83. Corpus Juris defines the word “actual” as “real, present, visible, existent; existing at the time; existing in fact.”
 

 
 *611
 
 What could be a more real and existing damage to a person of good reputation than confinement in the county jail upon a charge concededly erroneous? Such damage is actual, so real, present, and existing, in fact, that the unlawful restraint by one person of the physical liberty of another gives rise to a cause of action all its own, namely, that of false arrest. We have little sympathy with the proposition that a genuine damage would be proved here if the bank’s act had resulted in a damage to the plaintiff in his trade or occupation, .but that the dishonor thrust upon him by this act of negligence has no existence in fact.
 

 Upon both features of the case we think that the judgment of the courts below was erroneous, and the judgment will be reversed, and the case remanded to the court of common pleas for further proceedings according to law.
 

 Judgment reversed and cmse remanded.
 

 Robinson, Matthias and Day, JJ., concur.