[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 609.]

QUEEN CITY TERMINALS, INC., ET AL., APPELLEES, *v*. GENERAL AMERICAN
TRANSPORTATION CORPORATION ET AL.; TRINITY INDUSTRIES, APPELLANT.

[Cite as *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
1995-Ohio-285.]

*Negligence—Proof of indirect economic damages—Tangible physical injury to
persons or tangible property damage.*

In order to recover indirect economic damages in a negligence action, the plaintiff
must prove that the indirect economic damages arose from tangible
physical injury to persons or from tangible property damage.

(No. 94-113—Submitted March 21, 1995—Decided September 6, 1995.)

APPEAL from the Court of Appeals for Hamilton County, Nos. C-920088 and
C-920112.

_____

{¶ 1} Queen City Terminals, Inc. ("QCT") is the owner of a river and rail
terminal in Cincinnati that handles liquid chemical and petroleum products. The
company is located in a residential neighborhood, Columbia Tusculum, on the
city's east end. In December 1983, QCT contracted with BP[1] to receive at least
100 million gallons of benzene yearly by railroad from a BP refinery in Lima, Ohio.
The benzene was to be temporarily stored at the QCT facilities and from time to
time loaded onto barges for shipment by river to the Gulf of Mexico.

_____

1. Originally, the named defendants were the Standard Oil Company and Sohio Chemical Company.
During the pendency of the action, Standard Oil became known as Sohio Oil, and Sohio Chemical
Company became known as BP Chemicals America, Inc. The two will be collectively referred to
as "BP."

**{¶ 2}** Benzene is a hazardous chemical requiring careful handling. It is a flammable liquid that can have serious and toxic effects depending on the exposure. It has been identified as a possible carcinogen.

**{¶ 3}** As part of the contract, QCT was obligated to construct and/or modify its facilities to meet BP's requirements and to obtain all necessary licenses and permits. QCT's terminal facilities were spread out on several parcels of land that were not contiguous. In particular, QCT's rail yard where BP's benzene was to be received was approximately one mile from QCT's river front property on which storage tanks and barge loading facilities were located. QCT was required to construct a new receiving, storage and delivery facility, much of it dedicated exclusively to BP's benzene needs, including a rail yard, improved storage tanks, a pipeline from the rail yards to the storage tanks, a barge transfer site, and various environmental controls. To make the terminal suitable for receiving BP's benzene shipments, QCT spent $7,395,000 for the improvements.

**{¶ 4}** The contract also obligated BP to make certain payments unconditionally to QCT regardless of whether BP's benzene was actually put through its terminal and regardless of whether QCT was later prevented by governmental agencies from handling benzene. The payments, to be calculated by QCT in April 1985 at the rate of $160,227 per month plus applicable utility charges, were to reimburse QCT for its capital investment.

**{¶ 5}** BP contracted with General American Transportation Corporation ("GATX")[2] to lease a sixty-car "TankTrain" to transport the benzene from Lima to QCT's terminal in Cincinnati. The TankTrain is a patented design by GATX that permits strings of twelve to twenty cars with interconnecting hoses to be loaded and unloaded at one time from one end of the string.

---

2. "GATX" was used throughout the proceedings to refer collectively to defendants, General American Transportation Corporation and GATX Corporation.

**{¶ 6}** GATX contracted with Trinity Industries, Inc. ("Trinity") to manufacture the TankTrain cars. Trinity had never before built the patented cars. GATX supplied all of the plans and specifications, except that there were no plans for washouts for these particular tank cars. Washouts are holes in the bottoms of the cars and are used to clean the cars. GATX wanted the washouts to improve the cars' marketability when BP's lease ended. Trinity proposed welding leakproof plates over the bottom openings to seal them against leaks while BP used the cars. GATX rejected the welded plates and insisted that the cars be equipped with the bottom openings. Trinity designed new bottom openings with parameters set by GATX. The openings were covered by removable, bolted fittings. Below each fitting was another plate, a "blind flange," which was secured to the bottom of the car and served as a secondary seal. BP first objected, but ultimately agreed to the TankTrains being built with the washouts. On December 3, 1984, the last of the manufactured sixty TankTrain cars was shipped by Trinity.

**{¶ 7}** In the meantime, because QCT did not own or control property between its two facilities, it planned to transfer benzene from the rail yard to its river terminal by means of a pipeline that would lie in the right of way of three city streets. To construct and use the pipeline, QCT needed a street permit from the city of Cincinnati.

**{¶ 8}** Activist neighborhood groups initially opposed the issuance of the permit, termed a street privilege, expressing concern about the potential catastrophic effects from the escape of benzene. Various citizens and neighborhood groups lobbied the city council to deny the permit. Hearings were held during which GATX representatives vouched for the safety of the trains and the terminals, describing the TankTrain as "state of the art" and the safest form of rail transportation available. QCT retained a public relations firm and lobbied members of city council to win approval for the permit. Trinity was not involved in these

activities directly or indirectly but was aware of the difficulties in getting the permit.

{¶ 9} To satisfy concerns of both city council and the neighborhood groups, QCT agreed to restrictions on use of its facilities. QCT promised to handle benzene for no more than twelve years and to refrain from storing or handling a number of other hazardous chemicals. QCT also paid $50,000 to the main neighborhood opposition group. The neighborhood group withdrew its opposition to the project.

{¶ 10} In return, city council approved Ordinance 518-1984 on December 5, 1984, granting a revocable permit for "installation, maintenance, and operation of a fourteen-inch (14") pipeline under Airport Road, Carrel Street and Kellogg Avenue for the transportation of benzene." Immediately prior to passage of the ordinance, city council added language stating that "By accepting this permit, Queen City Terminals, Inc. * * * acknowledges and agrees that * * * the City may revoke this permit at any time for reasons reasonably related to safety, and will not contest such revocation."

{¶ 11} On February 20, 1985, thirty-six tank cars were loaded with 800,000 gallons of benzene in the Lima refinery and were inspected before leaving for Cincinnati and the first delivery of benzene to QCT. The TankTrain arrived early on February 21 at the QCT terminal and was placed on a siding, awaiting the transfer of the cargo. QCT had to wait for Ohio Environmental Protection Agency officials to arrive to observe the first use of QCT's equipment.

{¶ 12} In midmorning, car No. 17705 was discovered leaking benzene through the fittings and blind flange on the bottom of the car. A subsequent investigation revealed that eight of thirty-six TankTrain cars had leaked benzene. According to QCT's estimate, approximately forty gallons of the benzene that leaked from the cars escaped collection and soaked into the soil contaminating the immediate vicinity. The Ohio EPA required soil removal from QCT's premises where benzene had leaked into the soil. The Ohio EPA also found contamination

4

of ground water at QCT and required pumping and regular monitoring for six months. The contamination was cleaned up at a cost of about $144,458.

{¶ 13} Examination confirmed that the leaks came through the washouts. Trinity admitted that it negligently designed and manufactured the fittings and bottom washout openings that caused the leaks. Crucial parts were out of specification, including gaskets that were oversized, missing, misplaced and miscut, and interior plugs that were off-center. Washout nuts were not lock nuts as specified, and a gasket sealant had been used, contrary to industry standards. The tank cars were later repaired with welded plates.

{¶ 14} On February 21, 1985, the day of the leak, city council passed Ordinance 79-1985 temporarily suspending the street permit. During the next four weeks, public hearings were held to determine the cause of the leaks. On March 20, 1985, city council passed Ordinance 136-1985, permanently revoking the street permit for pipeline transportation of benzene.

{¶ 15} Following the incident, BP began shipping its benzene from the Lima refinery to a St. Louis terminal and ceased making payments to QCT. In 1985, QCT filed a complaint for breach of contract against BP in the Court of Common Pleas for Hamilton County. By third-party complaint, BP sought contribution, indemnity and damages from GATX and Trinity. In 1988, QCT and BP entered into a settlement agreement, under the terms of which BP agreed to pay QCT more than $8 million, but only if QCT would also sue GATX and Trinity and only if QCT's action was unsuccessful. QCT and BP then realigned as plaintiffs in a suit against GATX and Trinity.

{¶ 16} In the subsequent trial, the court directed a verdict against QCT and BP on their product liability, intentional tort and punitive damage claims against GATX and Trinity. On the remaining negligence claims, which the court allowed to go to the jury, GATX and Trinity were found liable, and QCT and BP were awarded $34,843,111 in damages. The trial court reduced the damages to

$26,803,018 by apportioning QCT and BP's share of the fault found by the jury. In its interrogatories to the jury and instructions, the court required the jury to determine liability separately for two distinct categories of damages alleged by the plaintiffs. Specifically, the court required the jury to separately apportion liability for (1) the direct harm resulting from the leak of benzene (the "leak damages"), and (2) the economic harm which resulted from Cincinnati City Council's enactment of legislation revoking the street privilege (the "revocation damages").

{¶ 17} The court entered judgment against Trinity making it liable for $15,258,468. Of that amount, Trinity was jointly and severally liable with GATX for $1,109,540 leak damages and separately liable for $14,148,928 revocation damages. After judgment was rendered, GATX settled with QCT and BP. Therefore, the only remaining assignments and cross-assignments of error are those relevant to the claims of QCT and BP against Trinity.

{¶ 18} On appeal, Trinity challenged only its liability for the "revocation" damages. BP and QCT filed a joint cross-appeal challenging, among other things, the trial court's dismissal of their claims based upon strict liability. With one judge dissenting, the Court of Appeals for Hamilton County affirmed the judgment of the trial court as to Trinity's appeal regarding the revocation damages. Addressing the issues raised in the cross-appeal of BP and QCT, the court of appeals held that their claims based upon strict liability should not have been dismissed.

{¶ 19} This matter is now before this court upon the allowance of a motion to certify the record.

_____

*Dinsmore & Shohl*, *Thomas S. Calder* and *Patrick D. Lane*, for appellee, Queen City Terminals, Inc.

*Keating, Muething & Klekamp*, *Louis F. Gilligan* and *Patrick F. Fischer*, for appellees, Sohio Oil Company and BP Chemicals America, Inc.

*Thompson, Hine & Flory*, *Jacob K Stein*, *Earle Jay Maiman* and *Jeffrey F. Peck*, for appellant.

———————————

**PFEIFER, J.**

I

{¶ 20} In its second proposition of law, appellant, Trinity, argues that the economic damages sustained by BP and QCT are not recoverable because the economic damages did not arise out of any personal injury or tangible property damage. Appellees, BP and QCT, argue that the mere coexistence of physical injury or property damage and economic damage makes the economic damages recoverable in tort absent privity of contract.

{¶ 21} As a result of the city of Cincinnati's exercising its right to revoke QCT's street permit, QCT alleged it sustained economic damages of $6.2 million in useless terminal improvements.

{¶ 22} Having been forced to reroute its benzene from its Lima plant to St. Louis as opposed to using the QCT terminals in Cincinnati, BP alleges that it also sustained economic damages in the form of lost profits from lower sales and increased transportation costs.

{¶ 23} This court has not previously determined when indirect economic losses are recoverable in tort when a physical injury or other direct property damage has also been sustained.

{¶ 24} In deciding this issue, we first distinguish direct economic losses from indirect economic losses. As defined by this court in *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989) 42 Ohio St. 3d 40, 537 N.E.2d 624, "'[d]irect' economic loss includes the loss attributable to the decreased value of the product itself. Generally, this type of damages encompasses 'the difference between the actual value of the defective product and the value it would have had had it not been defective.'" *Id.* at 43, 537 N.E.2d at 629. "Indirect" economic loss includes the

consequential losses sustained, which may include the value of production time lost and the resulting lost profits. *Id.* at 44, 537 N.E.2d at 629.

**{¶ 25}** We conclude that the economic damages sought by BP and QCT are indirect economic damages. The lost profits and additional expenses of BP and the diminished value of QCT's terminal were not economic losses caused by the failure of the bottom washouts. Instead, the economic losses were caused by the revocation of QCT's street privilege.

**{¶ 26}** The ultimate question in this case is whether Trinity is liable to BP and QCT for these indirect economic losses. In Chemtrol, we held that in the absence of injury to persons or damage to other property, economic losses may be not recovered in the tort theories of strict liability or negligence. *Id.* at paragraph one of syllabus. In this case, both BP and QCT sustained some property damage. BP lost benzene, and QCT had the premises that it leases damaged by the benzene spill. Thus, Chemtrol does not preclude the recovery of indirect economic losses for BP or QCT.

**{¶ 27}** In deciding Trinity's liability to BP and QCT, we hold that in order to recover indirect economic damages in a negligence action, the plaintiff must prove that the indirect economic damages arose from tangible physical injury to persons or from tangible property damage. Indirect economic damages that do not arise from tangible physical injury to persons or from tangible property may only be recovered in contract.

**{¶ 28}** In a discussion of economic damages, this court in *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St. 3d 1, 3, 560 N.E. 2d 206, 208, cited with approval the following excerpt from Prosser and Keeton's treatise on torts:

"In the absence of privity of contract between two disputing parties[,] the general rule is 'there is no * * * duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to

persons and tangible things.' Prosser & Keeton, Law of Torts (5 Ed. 1984) 657, Section 92."

{¶ 29} The converse of this statement is also true: there *is* a duty to avoid intangible economic loss or losses to others that *do arise* from tangible physical harm to persons and tangible things.

{¶ 30} Thus, the mere coupling of personal injury or property damages with indirect economic damages is not enough to entitle a plaintiff to recover the indirect economic damages. The plaintiff must show that the indirect economic damages *arose from* the property damage or personal injury. There must be a direct causal nexus between the tangible damage and the indirect economic losses in order for the economic losses to be recoverable.

{¶ 31} We decline to apply this rule to direct economic damages because, by definition, they arise from property damage. As stated earlier, direct economic damages result from the diminished value of the defective product itself.

{¶ 32} We must now apply these standards to the jury verdicts awarded to BP and QCT. "It is the duty of the trial court in a jury trial to submit to the jury the question of proximate causal relationship between the injury received and the result claimed, where the evidence is such that reasonable minds might reach different conclusions upon that question." *Bowling v. Indus. Comm.* (1945), 145 Ohio St. 23, 30 O.O. 245, 60 N.E. 479, paragraph three of syllabus.

{¶ 33} Thus, we must examine the verdicts awarded to BP and QCT separately in order to determine whether reasonable minds could conclude that each party's indirect economic damages arose from its physical injury or property damage.

{¶ 34} We find that the important distinction separating the indirect economic damages of QCT from those of BP is that QCT's economic damages arose from a direct and continuous causal chain of events beginning with its property being damaged and ending with its terminal being rendered worthless. For

BP, there is no similar chain of events linking its indirect economic damages with its loss of benzene.

A

{¶ 35} We first examine QCT's indirect economic damages, which include over $6 million dollars in useless terminal improvements stemming from the failure of the benzene project with BP. We find that reasonable minds could conclude that QCT's indirect economic damages did arise from tangible physical injury or tangible property damage to QCT. QCT leased the property which was contaminated with benzene. Because of this contamination to the property, the city of Cincinnati revoked the benzene street permit which was issued exclusively to QCT.

{¶ 36} In fact, the city's action in response to the spill focused exclusively on QCT and not BP. City of Cincinnati Ordinance 136-1985 revoked the previously suspended street permit granted to QCT. The ordinance provided for the removal of the already received benzene by QCT "to secure against its release in time of flood or to allow that stock of benzene to be removed from the City." Following the removal of the already received benzene, the ordinance also ordered QCT to physically seal the pipeline that connected QCT's terminal with its unloading facilities. The city council's issuance, suspension and revocation of the street permit for QCT compels us to find that there is a sufficient causal nexus between the contamination of property leased by QCT and QCT's indirect economic damages to impose liability upon Trinity.

{¶ 37} Because of this causal nexus, the jury's verdict in favor of QCT and against Trinity was appropriate. We affirm the portion of the judgment of the court of appeals discussing this verdict.

B

{¶ 38} We next examine BP. BP's indirect economic damages consisted of rerouting damages incurred from having to ship benzene through St. Louis instead

of Cincinnati. BP alleges that its rerouting damages were comprised of lost profits incurred due to lower sales and increased costs. The pertinent question is whether these rerouting damages arose from physical injury to persons or tangible property damage to BP. We find that they did not. We find no causal nexus between BP's loss of benzene, which is BP's only property damage, and the company's rerouting damages. BP's rerouting damages arose from the revocation of the QCT's street permit by the city of Cincinnati. There is no evidence that the city's revocation arose from BP's loss of benzene.

**{¶ 39}** We find that from the evidence in this case reasonable minds could only conclude that BP's rerouting damages did not arise from BP's loss of forty gallons of benzene. Thus, we conclude that BP's indirect economic damages are not recoverable. Because BP was not entitled to recover its indirect economic losses, we hold that the trial court improperly overruled Trinity's motion for a directed verdict against BP on this issue. We therefore reverse the $8,249,428 judgment against Trinity and in favor of BP on the revocation damages. The judgment of the court of appeals affirming this trial court's judgment is reversed.

II

**{¶ 40}** In its third proposition of law, Trinity contends the court of appeals erred, because "[o]ne who contracts to buy goods or services has no right of recovery against a person whose tortious act interferes with his supplier's ability to provide the contracted goods or services." This issue was neither raised in Trinity's assignments of error submitted to the appellate court nor addressed by the court of appeals in its opinion. We, accordingly, decline to discuss this proposition of law and reject it. *Moats v. Metro Bank of Lima* (1976), 40 Ohio St. 2d 47, 49-50, 69 O.O.2d 323, 319 N.E.2d 603, 604.

III

**{¶ 41}** In its fourth proposition of law, Trinity contends that QCT may not recover economic damages from Trinity because the economic damages that QCT

11

incurred had resulted from BP's breach of contract with QCT and not from Trinity's negligence.

{¶ 42} In essence, Trinity argues that BP's breach of contract—and not Trinity's negligence—was the legal cause of QCT's damages. In Ohio, the "substantial factor" test is used to determine liability when factors other than the negligence of the tortfeasor may have caused the plaintiff's damages. *Pang v. Minch* (1990), 53 Ohio St.3d 186, 559 N.E.2d 1313. In *Pang*, this court declared that:

"Where a plaintiff suffers a single injury as a result of the tortious acts of multiple defendants, the burden of proof is upon the plaintiff to demonstrate that the conduct of each defendant was a substantial factor in producing the harm." *Id.* at paragraph five of syllabus.

{¶ 43} The present case presents a factual scenario that differs slightly from that discussed in *Pang*. Instead of concurrent tortfeasors causing the same injury, a tortfeasor and a party who has allegedly breached a contract may have caused the same injury. Nevertheless, we apply the rule announced in *Pang* to this case. In order to prove that the economic damages incurred by QCT were the legal result of Trinity's negligence, QCT has the burden of proving that Trinity's conduct was a substantial factor in producing QCT's damages.

{¶ 44} The determination of whether an actor's conduct was a substantial factor in producing the plaintiff's injury is a question of fact to be determined by the trier of fact. See *Baldridge v. Wright Gas Co.* (1951), 154 Ohio St. 452, 43 O.O. 369, 96 N.E.2d 300, paragraph three of the syllabus. The trial court in this case instructed the jury on the substantial factor standard prior to it retiring for deliberation. The record is replete with evidence supporting the jury's determination that Trinity's negligence was a substantial factor in causing QCT's economic damages. As stated previously, in response to the benzene being leaked on QCT's leased property, the Cincinnati City Council revoked its street permit. As

12

a result, the expensive improvements made to QCT's terminal facility became worthless. Because the evidence at trial supports the jury's determination, we reject Trinity's fourth proposition of law.

IV

{¶ 45} In its first proposition of law, Trinity contends that BP and QCT cannot be held liable in tort for the economic damages incurred because the damages were caused by legislation enacted by a publicly elected governmental body. In its fifth proposition of law, Trinity also contests the trial court's instructions to the jury concerning the proper proof of foreseeability of an intervening cause. There are thus two issues. First, was Trinity's admitted negligence the proximate cause of the Cincinnati City Council's revocation of the privilege, or was the revocation an intervening cause of the damage? Second, was the revocation of the privilege foreseeable? These contentions can be resolved by carefully reviewing elementary principles of Ohio tort law and scrupulously applying them to the facts.

{¶ 46} Proximate causation has been described as "some reasonable connection between the act or omission of the defendant and the damage the plaintiff has suffered." Prosser & Keeton, Law of Torts (5 Ed. 1984) 263, Section 41. The revocation of the street permit was the cause of the economic damages suffered by QCT. This is not challenged. The issue is whether the conceded negligence of Trinity was the proximate cause of QCT's damage. Special Interrogatory No. nine discussing QCT's claims for revocation damages was posed to the jury as follows: "Trinity was negligent. Was Trinity negligent in a manner that proximately caused revocation damages to Queen City?" The jury responded "yes."

{¶ 47} There is sufficient evidence in the record to support the jury's response. The explicit purpose of the agreement between BP and QCT included the transportation of benzene and other chemicals by pipeline. Cincinnati

Ordinance 518-1984 defined the terms and conditions for the granting of a "revocable street privilege * * * to permit the installation, maintenance, and operation of a fourteen inch (14") pipeline * * * for the transportation of benzene and other materials handled by [QCT]." Specific safety measures were designated by experts to be instituted by QCT in order to safely transport and unload the benzene. Most significantly, Cincinnati Ordinance 136-1985, passed March 20, 1985, stated the rationale for the city council's revocation of the privilege: the benzene spill. It states, "Neither Council nor the residents in the surrounding community have continued confidence that the benzene transhipment system can be operated in the future without additional releases of benzene into the environment." Reasonable minds could conclude that Trinity's negligence prompted the revocation of the privilege and functioned as the proximate cause of QCT's damages.

{¶ 48} Trinity contends that the affirmative defense of intervening causation precludes QCT from recovering the economic damages incurred after the city revoked the street permit. We have long recognized that the connection between the defendant's act or omission and the damage or injury occasioned by the plaintiff may be broken by an intervening event. *R.H. Macy & Co. v. Otis Elevator Co.* (1990), 51 Ohio St.3d 108, 554 N.E.2d 1313. However, the discretionary nature of Cincinnati Ordinance 136-1985, which revoked the privilege granted to Queen City Terminals, Inc., does not necessarily preclude Trinity's liability for the economic consequences of the ordinance. "The mere fact that the intervention of a responsible human being can be traced between the defendant's alleged wrongful act and the injury complained of does not absolve him upon the ground of lack of proximate cause if the injury ensued in the ordinary course of events, and if the intervening cause was set in motion by the defendant." *Mouse v. Cent. Sav. & Trust Co.* (1929), 120 Ohio St. 599, 167 N.E. 868, paragraph one of the syllabus.

**{¶ 49}** Intervening causation is not proven if the alleged intervening cause was reasonably foreseeable by the one who was guilty of the negligence. *Neff Lumber Co. v. First Natl. Bank of St. Clairsville* (1930), 122 Ohio St. 302, 309, 171 N.E. 327, 330. "'It is not necessary that the defendant should have anticipated the particular injury; it [is] sufficient that his act was likely to result in injury to some one.'" *Id.* We reaffirm the principle upheld in *Neff* that a particular defendant need not foresee the specific harm caused by its negligence, if the harm would have been foreseeable to a reasonably prudent person. Cf. *Menifee v. Ohio Welding Products, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180, 472 N.E.2d 707, 710.

**{¶ 50}** The test used to determine foreseeability of the intervening cause to the original negligent actor is "whether the original and successive acts may be joined together as a whole, linking each of the actors as to the liability, or whether there is a *new* and *independent* act or cause which intervenes and thereby absolves the original negligent actor." (Emphasis added.) *Cascone v. Herb Kay Co.* (1983), 6 Ohio St.3d 155, 160, 6 OBR 209,214, 451 N.E.2d 815, 819. This is the standard that was read to the jury in Instruction No. 14. When applying the *Cascone* test, the term "independent" means the "absence of any connection or relationship of cause and effect between the original and subsequent act of negligence." *Leibreich v. A.J. Refrigeration, Inc.* (1993), 67 Ohio St.3d 266, 269, 617 N.E.2d 1068, 1022. The term "new" means that the second act could not reasonably have been foreseen.

**{¶ 51}** Special Interrogatory No. 17 asked the jury if there was "an intervening act that relieved Trinity of liability to Queen City for revocation damages." The jury responded "no."

**{¶ 52}** There is sufficient evidence in the record for the jury to conclude that the city council's revocation of the street permit was not independent of Trinity's negligence. Trinity conceded negligence from the outset of this action. A plant manager from Trinity testified at trial that, during his dealings with GATX, it was "common knowledge" that there was local opposition to the benzene project.

BP's project manager testified that he stressed to Trinity the importance of the fittings on the TankTrains because QCT "was in the process of obtaining permits, and anything that will jeopardize those permits might be a possible leak from the TankTrain." Based upon this evidence reasonable minds could have fairly concluded that the actions taken by city council in response to the benzene leak were reasonably foreseeable and thus not an intervening cause. Accordingly, we reject Trinity's first and fifth propositions of law.

V

**{¶ 53}** In its sixth proposition of law, Trinity contends that the trial court correctly entered a directed verdict as to BP's and QCT's products liability claim against Trinity. BP and QCT argue that the Trinity's faulty manufacture of the TankTrain falls within the realm of products liability law, and thus recovery should be allowed in strict liability. The appellate court held that the directed verdict was incorrect because commercial entities are not precluded as plaintiffs in product liability cases.

**{¶ 54}** Because the products liability claim accrued before January 5, 1988, it is governed by 2 Restatement of the Law 2d, Torts (1965), Section 402(A), adopted by this court in *Temple v. Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O.3d 466, 364 N.E.2d 267, and not by R.C. 2307.71 to 2307.80. Under certain circumstances when a defective product injures a user or consumer, that consumer is entitled to recover damages from the manufacturer in strict liability. It is accepted that large commercial entities are consumers and can bring products liability claims against the manufacturer of the goods that they consume. *Chemtrol*, *supra*, 42 Ohio St.3d at 42, 537 N.E.2d at 628.

**{¶ 55}** The Restatement, though, does not specify exactly what constitutes a product meriting the application of strict liability. Strict liability developed to achieve specific policy objectives. Situations which would not further these objectives have long been recognized to be outside the purview of strict liability.

Restatement Section 402A, Comment *f*. We first examine the reasons for imposing strict liability on manufacturers of defective products.

A

Policy Behind Products Liability

{¶ 56} The policies underlying products liability doctrine are noted within the Restatement and have been consistently recognized by this court. The first and foremost objective of strict liability is to promote product safety. The doctrine of strict products liability provides manufacturers a strong incentive to design, manufacture, and distribute safe products. Prosser & Keeton, Section 4 at 25-26. "The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods." Restatement Section 402 A, Comment, *f*. This court has expressly stated that "the public interest in human life and safety can best be protected by subjecting manufacturers of defective products to strict liability in tort when the products cause harm." *Leichtamer v. Am. Motors Corp.* (1981), 67 Ohio St. 2d 456, 464-465, 21 O.O.3d 285, 291, 424 N.E.2d 568, 575.

{¶ 57} A second objective of products liability stems from a cost-shifting rationale. The Restatement elaborates that "public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production." Restatement Section 402 A Comment *c*. The assumption is that manufacturers are in a better position to bear the costs of injuries, because they have the ability to "distribute the losses of the few among the many who purchase the products" by charging higher prices. Prosser & Keeton at 693; *Bowling v. Heil Co.* (1987), 31 Ohio St. 3d 277, 284, 31 OBR 559, 565, 511 N.E.2d 373, 378-379. The manufacturer is thus seen as better able to internalize the costs of injuries than the general public.

**{¶ 58}** A third justification for strict liability is that proving negligence can be difficult and costly for the average consumer. Strict liability therefore provides the consumer with a degree of protection from a manufacturer that has launched its product into the stream of commerce. Prosser & Keeton at 693.

B

Reasoning

**{¶ 59}** We find that the product here was coaxed into the market by its consumers. Trinity did not launch this product into the stream of commerce. This was a custom-made order, fashioned expressly at the request of GATX. Because we find that none of the commonly accepted reasons supporting the imposition of strict liability applies to the TankTrain, we find relief based on strict liability in tort is not appropriate in this case.

**{¶ 60}** First, safety policy is not furthered by holding manufacturers in the situation of Trinity strictly liable. The process of manufacturing a custom-made item such as the TankTrain heavily involves the consumers, GATX and BP, in making manufacturing decisions, computing risks, and setting safety specifications. The incentive for Trinity to design and manufacture washout gaskets for the TankTrains came entirely from the demands of their customer, GATX, which wished to be able to easily reuse the cars at the termination of BP's lease of the TankTrains. BP acquiesced in these demands. Trinity made safety concerns known at that time, and expressed a preference for welding. The decision whether or not to use washouts, however, was not Trinity's decision to make. It does not promote product safety to hold manufacturers strictly liable for the decisions of their consumers.

**{¶ 61}** The cost-shifting rationale for strict liability does not pertain to the facts at hand either. Trinity is not in any better position to assume the costs than the customers in this case. The manufacture of TankTrains is not a mass-scale enterprise for Trinity. GATX owns the design and sole right to manufacture

18

TankTrains. It was GATX that selected Trinity to produce a specific, one-time order of TankTrains to meet the appellees' need. Trinity fulfilled a specific, limited, custom-made order for one client, GATX. In such a case, the manufacturer has no opportunity to spread the costs throughout its many customers, because no other customers exist. It would be no more efficient for Trinity to internalize the costs of injuries here than for GATX or the ultimate consumer, BP, to do so.

{¶ 62} The appellee does not need the extra protections afforded a typical consumer of off-the-shelf products. BP's experts were heavily involved in the manufacturing process of the TankTrain. BP's manager for the TankTrain project, Mamouh Hamsho, testified that BP requested and received plans for the TankTrain, subjected them to the scrutiny of the appellee's Central Engineering Unit, which consisted of over one hundred engineers, and solicited outside consultation. Hamsho conducted a personal inspection of Trinity's facility during the manufacture of the TankTrain. Further, Hamsho's testimony indicates that BP was actively involved in a dialogue with GATX and Trinity concerning the design and specifications of the TankTrain, including the decision to install washout plugs instead of welding. Due to this heavy involvement in the manufacturing process, BP was in a position to know and prove that the manufacturer might have been negligent.

{¶ 63} It is the decision of this court that strict liability does not extend to the type of product involved in this case. Accordingly, we reverse the portion of the judgment of the court of appeals holding that appellees were entitled to proceed to trial on their claim of strict products liability against Trinity. This holding is not meant to be a panacea for all manufacturers of defective products, but is instead intended to address the rare factual circumstance where the purchaser and lessee of a product are heavily involved in the manufacturing process of the defective item.

*Judgment affirmed in part*
*and reversed in part.*

MOYER, C.J., WRIGHT and F.E. SWEENEY, JJ., concur.

DOUGLAS, RESNICK and COOK, JJ., concur in part and dissent in part.

_____

**ALICE ROBIE RESNICK, J., concurring in part and dissenting in part.**

{¶ 64} I concur in part and dissent in part.  I would affirm the judgment of the court of appeals in all respects.

DOUGLAS, J., concurs in the foregoing opinion.

_____

**COOK, J., concurring in part and dissenting in part.**

{¶ 65} I concur in that part of the majority's decision finding strict liability in tort inapplicable to this case.  I also concur in the majority's judgment that Trinity is not liable to BP for revocation damages, but do so for different reasons.  I respectfully dissent, however, from the majority's decision that Trinity is liable to QCT for its revocation damages.  The crux of the case, for me, rests upon the issues of proximate cause and intervening cause, and I would reverse the entire decision of the court of appeals and enter judgment for Trinity on all issues.

{¶ 66} The majority opinion accepts the general proposition that Trinity, a company manufacturing tank cars for GATX to transport benzene, can be liable to QCT, for $14 million in damages based on the breach of contract between BP and QCT, which hinged on the use of a revocable pipeline license, obtained (*after* shipment of the tank cars) by lobbying city council, and thereafter revoked by council when forty gallons leaked onto QTC's property, with cleanup costs of $144,458.  Incredibly, BP and QCT contracted for this huge venture on the slender thread of a "revocable street privilege" granted by council only until safety concerns warranted revocation.  It was foreseeable that the privilege would be short-lived, given the risk to the public inherent in QTC's plan to receive one hundred million gallons of benzene per year by train, unload it through pipelines and store it prior to transferring it to river barges.  QCT, of course, had no recourse

against the city for the revocation. Moreover, BP and QCT contemplated the revocation by providing BP with the right to terminate the contract based on QTC's inability to perform its obligations as a result of "municipal order, rule, legislation or regulation." Despite these facts, the majority decision permits the conclusion that legal causation for the contract damages rests with Trinity.

LEGISLATIVE ENACTMENTS AS PROXIMATE CAUSE

**{¶ 67}** I view the proximate cause of the breach of contract damages in the case to be the ordinance revoking the street privilege. As the majority notes in Part IV of its analysis, Trinity argues that a private citizen ought not to be required to answer in damages for the economic consequences of the discretionary enactments of a publicly elected body. Whether the liability should be recognized is a question of public policy.

**{¶ 68}** Justice Scalia aptly assessed the unforeseen factors affecting legislative action when he wrote: "[A legislator] may have thought the bill would provide jobs for his district, or may have wanted to make amends with a faction of his party he had alienated on another vote, or he may have been a close friend of the bill's sponsor, or he may have been repaying a favor he owed the majority leader, or he may have hoped the Governor would appreciate his vote and make a fundraising appearance for him, or he may have been pressured to vote for a bill he disliked by a wealthy contributor or by a flood of constituent mail, or he may have been seeking favorable publicity, \*\*\* or, of course, he may have had (and very likely did have) a combination of some of the above and many other motivations." *Edwards v. Aguillard* (1987), 482 U.S., 578, 637, 107 S.Ct. 2573, 2606, 96 L.Ed.2d 510, 553-554 (Scalia, J., dissenting).

**{¶ 69}** I agree with several of Trinity's policy arguments disfavoring liability based on legislative action. First, municipal corporations are exempt from liability in negligence for the consequences of their legislative discretion. The majority's analysis permits BP and QCT to recover indirectly what they could not

recover directly. Second, as an analogy, federal courts have held that in antitrust cases, even if a defendant lobbied for the passage of legislation that would harm the defendant's competitors, the harmed competitors could not recover against the defendant. See, *e.g.*, *United Mine Workers of Am. v. Pennington* (1965), 381 U.S. 657, 669-670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626, 635-636; *E. RR. Presidents Conference v. Noerr Motor Freight, Inc.* (1961), 365 U.S. 127, 135-138, 81 S.Ct. 523, 528-530, 5 L.Ed.2d 464, 470-472; *Potters Med. Ctr. v. City Hosp. Assn.* (C.A. 6, 1986), 800 F.2d 568, 577-579. Third, the integrity of the legislative process could be inhibited by recognition of legislation as causation in tort. Legislators could thereby be positioned to choose between the public good and the prospect of exposing a constituent to personal liability for some past act of negligence, and could be required to appear as witnesses in litigation surrounding legislation that affected contractual relationships. This court has never found a party liable for economic damages resulting from a legislative act.

PROXIMATE AND INTERVENING CAUSE

{¶ 70} Whether this case is analyzed under the issue of proximate cause or intervening cause, the Cincinnati City Council's revocation of the street license and BP's ultimate breach of the contract were not reasonably connected to Trinity's negligence in installing the fittings and bottom washouts in the TankTrain cars.

{¶ 71} "As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability." Prosser & Keeton, Law of Torts (5 Ed. 1984) 264, Section 41. Applying either proximate cause or intervening cause to this case, I would find either that BP and QCT did not meet their burden on the issue of proximate cause or that Trinity did meet its burden on the issue of intervening cause. In a sense, Trinity's negligence in installing the fittings and bottom washouts in the TankTrain cars caused BP's benzene to leak at QCT's railroad yard, which in turn caused Cincinnati's City Council to enact the ordinance

revoking the street privilege, which next caused QCT to breach its contract with BP because it could no longer ship benzene through the pipes, which triggered BP's voluntary breach of its contract with QCT. It is this final consequence upon which QCT's damages are based.[3] Separate intentional acts, however, intervened between Trinity's negligence and the consequence for which it is being held responsible, that is, the discretionary act of the legislative body, and the conditions surrounding the arrangements between BP and QCT which were poised for disaster from the outset.

{¶ 72} Although the chain of events may, in hindsight, seem foreseeable, that does not equate with legal responsibility. An actor is not liable for every harm that may result from his actions, and it is the court's duty to confine liability within manageable limits. Imagine whether Trinity would have undertaken the contract to build the TankTrains if it had known that a forty-gallon leak would render it liable for the collapse of an eight-figure deal. Would it have agreed to build the TankTrains if it knew that the only thing between it and financial disaster was the will of a city council to continue to permit the transportation of a hazardous substance through a city neighborhood?

{¶ 73} The revocation of the street privilege as a cause of the breach of contract was not a reasonably foreseeable consequence of Trinity's negligence. Intervening were the action of the city council and the combined actions of BP and QCT. These are the acts that proximately caused the damages of which BP and QCT complain, not the faulty seals installed by Trinity.

---

3. I would also note that an issue exists as to whether QCT suffered any legally compensable damages from city council's revocation of the street permit. QCT calculated its damages based on what it expected to receive in payments under its contract from BP. An issue exists as to whether BP was unconditionally liable to pay QCT either payments or the costs of QCT's capital improvements regardless of whether BP used the terminal. If BP was obligated to continue its contractual payments to QCT notwithstanding the revocation, then QCT's damages resulted from BP's breach of the contract and not from the revocation. Further, BP and QCT entered into a settlement agreement, under which BP agreed to pay QCT approximately $8 million only if QCT would itself sue GATX and Trinity and only if the suit was unsuccessful.

**{¶ 74}** As the trial court should have directed a verdict for Trinity on the basis of proximate cause or intervening cause, that disposition would obviate any discussion of direct and indirect economic damages and interpretation of *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 537 N.E.2d 624.

**{¶ 75}** For the foregoing reasons, I would reverse the decision of the court of appeals and enter judgment in favor of Trinity.

_____